to compel arbitration because arbitration clause never became binding on the parties). Thus an order from this Court in aid of arbitration would be both futile and contrary to the CREFAA.

## IV. TRADITION IS JUDICIALLY ESTOPPED FROM ASSERTING THAT IT HAS BEEN HARMED BY THE SAME HIRING PRACTICES THAT IT ADVOCATES ELSEWHERE

Tradition cannot have it both ways – it cannot argue before one New York court that when it "raids" a competitor, such conduct is permissible, but then argue before another New York court that when a competitor "raids" Tradition, such conduct is impermissible. Indeed, in recent litigation spawned from Tradition's "raid" of more than a dozen employees from industry competitor GFI Securities LLC ("GFI"), Tradition's 90+ page brief in opposition to GFI's application for a preliminary injunction asserts (as the very first point) that GFI was estopped from complaining of harm by Tradition:

> The doctrine of judicial estoppel "preclude[s]" a party who assumed a certain position in a prior legal and who [obtained relief thereon] from assuming a contrary position in another action simply because [its] interests have changed." *D&L Holdings, LLC v. RCG Goldman Co. LLC*, 287 A.D.2d 65, 71, 734 N.Y.S.2d 25, 30 (1st Dep't 2001) (internal quotations and citation omitted). Because judicial estoppel focuses on the relationship between a litigant and the judicial system, *see, e.g.*, *City of New York v. Black Garter*, 179 Misc. 2d 597, 599, 685 N.Y.S.2d 606, 607 (Sup. Ct. Richmond County l999), *aff'd* 273 A.D.2d 188, 709 N.Y.S.2d 110 (2d Dep't 2000), courts invoke the doctrine of judicial estoppel to prevent parties from adopting inconsistent positions in separate legal proceedings "because the judicial system cannot tolerate this playing fast and loose with the courts." *Prudential Home Mortgage Co., Inc. v. Neildan Constr. Corp.*, 209 A.D.2d 394, 395, 618 N.Y.S.2d 108, 110 (2d Dep't 1994) (internal quotations and citations omitted); see also Kimco of N.Y., Inc. v. Devon, 163 A.D.2d 573, 576, 558 N.Y.S.2d 630, 633 (2d Dep't 1990) (denying party right to assert inconsistent positions in separate actions because "defendant's adoption of inconsistent positions in pursuit of his own interested has sufficiently manipulated and impaired the dignity of judicial proceedings to require that he be estopped").

Tradition Brf. at 41-42.

Tradition's estoppel argument in justification of its GFI hires is equally applicable *to Tradition* here because it advanced positions in a New York court "that are diametrically

21

opposed to the positions it now asserts." *Id.* at 42. Directing Tradition's argument back upon itself, if Tradition "believes that this kind of behavior is not only permissible but part of its own routine, it cannot complain to this Court when other market participants behave accordingly. Consequently, [Tradition] should be judicially estopped from asserting herein positions directly contrary to the positions it advanced," successfully, in another recent New York action. *Id.* at 44; *see GFI Securities LLC v. Tradition Asiel Securities Inc.*, 21 Misc.3d 1111(A), 873 N.Y.S.2d 511, 2008 WL 4559921 (N.Y.Sup. July 28, 2008), *aff'd*, 61 A.D.3d 586, 878 N.Y.S.2d 689 (1st Dep't 2009).

Tradition's unclean hands argument against GFI is also equally applicable to Tradition here:

> At a minimum, [Tradition] should be denied equitable relief due to its own unclean hands. *See, e.g.*, *Levy v. Braverman*, 24 A.D.2d 430, 430, 260 N.Y.S.2d 681, 683 (1st Dep't 1965) ("Where a litigant has himself been guilty of inequitable conduct with reference to the subject matter of the transaction in suit, a court of equity will refuse him affirmative aid."); *Ray Kline, Inc. v. DaVega-City Radio*, 168 Misc. 185, 187, 4 N.Y.S.2d 541, 543 (Sup. Ct. Westchester County 1938) ("If defendants' acts constitute unfair competition, then it would seem that plaintiffs are equally guilty of unfair competition and should be denied equitable relief."); *Kaufman v. Kehler*, 25 A.D.3d 765, 808 N.Y.S.2d 764 (2d Dep't 2006) (dismissing cause of action brought by party who violated the same restrictive covenant it sought to enforce due to the party's unclean hands).

Tradition Brf. at 44-45. The Court should, therefore, reject Tradition's application for injunctive relief for the same reasons.

## V.    THE FOREIGN DEFENDANTS ARE NOT SUBJECT TO THE JURISDICTION OF NEW YORK AND THE FORUM IS ENTIRELY INCONVENIENT

### A.    Tradition's Application Should Be Denied Because It Cannot Establish Jurisdiction Over the Foreign Defendants.

"In diversity cases, federal courts must look to the forum state's long-arm statute to determine if personal jurisdiction may be obtained over a nonresident defendant," and then

decide whether the exercise of jurisdiction comports with the constitutional guarantee of due process. *Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir. 1990); *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir. 1963) (en banc). The plaintiff has the burden of proof in establishing personal jurisdiction over the defendant. *See GCG Int'l, Inc. v. Eberhardt*, No. 05 Civ. 2422 (DC), 2005 U.S. Dist. LEXIS 23877, at *5-6 (S.D.N.Y. Oct. 17, 2005). It is well settled that allegations that "lack the factual specificity necessary to confer jurisdiction" and "conclusory statements [] without any supporting facts" will not satisfy this burden, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 15 (2d Cir. 1998) (internal quotations and citations omitted).

> **1.    Tradition has failed to establish long-arm jurisdiction under CPLR Section 302 (a)(1).**

CPLR Section 302(a)(1) confers specific jurisdiction upon New York courts over a non-domiciliary defendant if (1) the defendant transacts business in New York, and (2) the cause of action arises out of that business activity. *CPLR Section 302 (a) (1)* (McKinney 1990); *Bozell Group, Inc. v. Carpet Co-op of America Ass'n, Inc.*, No. 00 Civ. 1248 (RWS), 2000 U.S. Dist. LEXIS 15088, at *6 (S.D.N.Y. Oct 11, 2000).

> **a.    The Foreign Defendants do not "transact business" in New York.**

In determining whether a non-domiciliary defendant "transacts business" in New York, courts look to whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within [this State], thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The determination of whether or not a defendant can be said to have transacted business in New York depends on the "totality of circumstances." *See Painewebber Inc. v. Westgate Group, Inc.*, 748 F. Supp. 115, 118 (S.D.N.Y. 1990).

"Incidental" contacts with the state are insufficient, with courts instead looking for a "systemic pattern" of New York contacts. *Bozell Group, Inc.*, 2000 U.S. Dist. LEXIS 15088, at *18.

The totality of circumstances here plainly demonstrates that SIF ICAP do not transact business in New York. Rather, SIF ICAP are foreign companies, do not conduct business in New York, and have had only minimal contact with the State of New York, all for reasons unrelated to the issues in the Complaint. Indeed, the obligations under the Spanish Agreements were fully performed in Chile, the entirety of the alleged improper conduct at issue occurred in Chile, and the alleged loss of customers (which is denied) will take place in Chile, not New York. (Mosqeira Decl., ¶¶2-50; Sánchez Decl., ¶¶2-30, 36-51).

Opinions from this district are instructive. In *Painewebber Inc. v. WHV, Inc.*, No. 95 Civ. 0052 (LMM), 1995 U.S. Dist. LEXIS 6514, at *2-4 (S.D.N.Y. May 16, 1995), this Court held that it lacked jurisdiction even where the contract in question was signed in New York and one of the parties was headquartered here, finding that telephone negotiations, meetings and execution of an agreement in New York, and even the performance of an agreement in New York did not "project the [non-domiciliary defendant] into the New York market." *See Spencer Trask Ventures, Inc. v. Archos S.A.*, 01 Civ. 1169 (LAP), 2002 U.S. Dist. LEXIS 4396 (S.D.N.Y. March 18, 2002) (declining jurisdiction over a French corporation where plaintiff was a New York corporation and the contract was entered into in New York).

This Court also declined to exercise jurisdiction over a non-domiciliary defendant in a music copyright case, even though defendant's executives frequently traveled to New York on business and defendant had websites accessible in New York through which its radio broadcasts played the subject-matter music. *See Freeplay Music, Inc. v. Cox Radio, Inc.*, No. 04 Civ. 5238 (GEL), 2005 U.S. Dist. LEXIS 12397 (S.D.N.Y June 22, 2005). Even actual advertising in New

24

York has been deemed insufficient to invoke the Court's jurisdiction under the "solicitation" analysis. *See, e.g., Muollo v. Crestwood Vill. Inc.*, 155 A.D.2d 420, 547 N.Y.S.2d 87, 88 (2d Dep't 1989). *See also Campaniello Imports, Ltd. v. Saporiti Italia Sp.A.*, 95 Civ. 7685 (RPP), 1996 U.S. Dist. LEXIS 11064 (S.D.N.Y. Aug. 2, 1996), *aff'd* 117 F.3d 665 (2d Cir. 1997) (finding no 302(a)(1) personal jurisdiction over Italian citizens who conducted business activities in New York); *Pieczenik v. Dolan*, 03 Civ. 6336 (SAS), 2003 U.S. Dist. LEXIS 23295, at * 19 (S.D.N.Y. Dec. 30, 2003) ("the formation of a contract in England, albeit between an English citizen and a New York resident, does not amount to 'transacting business' in New York. The [defendant] did not purposefully avail itself of the laws of this forum simply because it entered into an agreement with a New York resident.").

Tradition's repeated reference to the New York choice of law and forum provisions in the English Contracts is meaningless because, as stated, those provisions are specifically null, void, and unlawful over the Chilean Employees and are inapplicable to SIF ICAP. Even if these provisions are given any credence, they remain insufficient as a matter of law to establish jurisdiction. "While it is appropriate to give some weight to [a] choice of law provision, . . . a choice of law clause alone is not dispositive." *Premier Lending Servs., Inc. v. J.L.J. Assocs.*, 924 F. Supp. 13, 17 (S.D.N.Y. 1996); *see also Varnelo v. Eastwind Transport, Ltd.*, No. 02 Civ. 2084 (KMW)(AJP), 2003 U.S. Dist. LEXIS 1424, at *35 (S.D.N.Y. Feb. 3, 2003) (forum shopping evident when plaintiff chose forum despite the lack of "availability of witnesses or evidence [in] the forum district.") (*quoting Iragorri*, 274 F.3d at 72)). Forum shopping is shown where "[t]here is no indication that the parties anticipated litigating in the United States or that the choice of this forum is based on true motives of convenience." *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 698 (S.D.N.Y. 2003), *aff'd* 98 F.3d 47 (2d Cir. 2004).

25

This is particularly so where, as here, "the jurisdictional contacts fall far short of the purposeful availment requirement." *Id.* Under the totality of the circumstances, the Foreign Defendants cannot be said to have "purposefully availed [themselves] of the privilege of conducting activities within [this State], thus invoking the benefits and protection of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

> **b.**      ***Tradition's claims do not arise out of any acts or omissions performed in New York.***

In addition to "transacting business" in New York, jurisdiction under CPLR Section 302(a)(1) requires a "substantial nexus between the transaction of business and the cause of action sued upon." *Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 956 F.Supp. 1131, 1134 (S.D.N.Y. 1997). Thus, to satisfy the second prong of the of the "Long Arm" test, Tradition must show that its claims "arise[] out of" SIF ICAP's transaction of business in New York "which requires an articulable nexus or a substantial relationship between transactions occurring within the state and the cause of action sued upon." *GCG Int'l, Inc.*, 2005 U.S. Dist. LEXIS 23877, at *15 (internal quotations and citation omitted). In analyzing this "nexus," the relationship between the business conducted in New York and the claims alleged by the plaintiff must be direct. *See Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 739 (S.D.N.Y. 2001).

As previously explained, none of Tradition's "causes of action" arise out of any activity in New York. To the contrary, *all* of the alleged improper conduct (which is denied) for which Tradition seeks relief occurred in Chile. As Tradition cannot demonstrate any nexus, much less

a direct one, between New York and the conduct at issue, the Court should decline to exercise jurisdiction over this extraterritorial matter.[16]

Although Tradition (wisely) elected not to brief the question of subject matter jurisdiction, Tradition's specious federal claims also fail to confer jurisdiction on this extraterritorial dispute. In *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118 (2d Cir. 1998), *cert.. denied*, 1999 U.S. LEXIS 1048, 1049 (1999), the Second Circuit affirmed the district court's ruling that it lacked subject matter jurisdiction over the plaintiff's federal securities fraud claims. The plaintiff company, EOC, was a Panamanian corporation with its principal place of business in Monaco and was wholly-owned by a Canadian citizen. The defendants were business entities organized under the laws of France, Luxembourg, and the Bahamas, and a United Kingdom national living and working in London. EOC alleged that an offer to sell foreign securities was made by telephone and fax to its Canadian owner who, at the time, happened to be in Florida, and that orders to purchase securities were placed by him while he was in Florida. Both the district court and the Second Circuit determined that the securities sales at issue were beyond the extraterritorial reach of federal securities laws and therefore outside the prescriptive jurisdiction of the United States because they had insufficient connection to the United States:

> [A] series of calls to a transient foreign national in the United States is not enough to establish jurisdiction under the conduct test without some additional factor tipping the scales in favor of our jurisdiction. Without such added weight, the exercise of prescriptive jurisdiction by Congress would be unreasonable within the meaning of the *Restatement of Foreign Relations* §§ 416 (2) and 403

---

[16] Tradition has plainly misjoined Tradition (North America) Inc. for the sole purpose of creating diversity jurisdiction over this dispute where it would not otherwise exist. See Universal Licensing Corp. v. Paola del Lungo S.p.A., 293 F.3d 579, 580-81 (2d Cir. 2002) ("diversity is lacking within the meaning of [§§ 1332(a)(2) and (a)(3)] where the only parties are foreign entities, or where on one side there are citizens and aliens and on the opposite side there are only aliens.") (affirming district court decision and order of Pauley, J.) (citations omitted).

(1987), and is particularly so when the transaction is clearly subject to the regulatory jurisdiction of another country with a clear and strong interest in redressing any wrong. We do not think Congress intended to make the securities laws have such a broad reach or to make U.S. courts available for such suits.

*Id.*, 147 F.3d at 129.

The principles explained above and in the *Restatement (Third), Foreign Relations*, govern the extraterritorial application of American laws, including the albeit frivolous Computer Fraud and Abuse Act ("CFAA") and Electronic Communications Privacy Act ("EPCA") claims asserted by Tradition. According to the *Restatement*, an American court's extraterritorial application of American laws must be based on: (1) conduct that, at least in substantial part, takes place within the United States; (2) the status of persons or interests of things that are present within the United States; (3) conduct that, although it takes place outside the United States, has or is intended to have substantial affect within its territory; (4) the activities, interests, status, or relations of American nationals, either within or outside its territory; or (5) conduct outside its territory, but directed against national security or other state interest. *Restatement (Third), Foreign Relations*, § 402.

Even if such a basis exists, an American court may only exercise its jurisdiction to apply American laws extraterritorially if it would be reasonable to do so. *Id.* § 403. Factors to be evaluated in making the reasonableness determination include: the extent to which the alleged activity takes place in the United States or has a substantial, direct, and foreseeable affect here; the connections of the parties to the United States; the extent to which another country may have an interest in regulating the conduct in question; and the likelihood of conflict with regulation by another country. *Id.*

As addressed in this brief and admitted by Tradition, several of these factors are absent here. Most importantly, *none* of the allegedly unlawful conduct—the deletion of text

28

messages—are even alleged to have occurred in the United States.  Even if such an act is

unlawful, which would be unprecedented, the deletion of text messages has no cognizable

impact, let alone a "substantial, direct, and foreseeable effect," on Tradition in the United States.

Moreover, Chilean law regulates the conduct that forms the basis for Tradition's claims and its

regulations conflict with those enacted by the United States.  Chile also has a superior interest in

protecting the rights of its workers (and companies) because the SIF ICAP Chile and the Chilean

Employees are resident in Chile.  For those reasons, it would be unreasonable for this Court to

exercise jurisdiction, even if it could find a basis for doing so.

> **2.    The Complaint fails because Tradition has not demonstrated—and cannot—that SIF ICAP has the requisite "minimum contacts" with New York.**

Even if Tradition established jurisdiction under state law, the exercise of such jurisdiction

can only take place if it "comports with the requisites of due process."  *Bensusan Restaurant*

*Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997).  In order to satisfy this constitutional due process

standard, there must at minimum be "some act by which the defendant purposefully avails itself

of the privilege of conducting activities within the forum State, thus invoking the benefits and

[the] protections of its laws."  *McKee Electric Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 382

(1967) (citing *Hanson*, 357 U.S. at 253).  Furthermore, the exercise of long-arm jurisdiction must

be based on "minimum contacts" with New York and must comport with "traditional notions of

fair play and substantial justice."  *International Shoe Co. v. Washington*, 326 U.S. 310, 316

(1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  The New York Court of Appeals'

warning is especially relevant:

> In our enthusiasm to implement the reach of the long-arm statute (CPLR 302),
> we should not forget that defendants, as a rule, should be subject to suit where
> they are normally found, that is, at their pre-eminent headquarters, or where they
> conduct substantial general business activities. Only in a rare case should they be

compelled to answer a suit in a jurisdiction with which they have the barest of contact.

*McKee*, 20 N.Y.2d at 383 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220 (1957)).

Tradition cannot establish the requisite minimum contacts between the Foreign Defendants and New York to satisfy due process requirements. Accordingly, the Foreign Defendants cannot be said to have "purposefully availed" themselves of the jurisdiction of this Court.

**B.    Application Of The Doctrine Of Forum *Non Conveniens* Warrants Denial Of Tradition's Application Because The Action Belongs In Chile, Not New York.**

"A federal court has discretion to dismiss a case on the ground of forum *non conveniens* when an alternative forum has jurisdiction to hear [the] case, and . . . trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or . . . the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems." *Sinochem Int'l. Co. Ltd. v. Malaysia Int'l. Shipping Corp.*, 127 S.Ct. 1184, 1190 (2007) (citations omitted). In analyzing a motion to dismiss for forum *non conveniens*, a court must determine whether an adequate alternative forum exists, determine the degree of deference to give to the plaintiff's choice of forum, and balance the public and private interest factors. *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) (*en banc*); *Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981), and *Gulf Oil v. Gilbert*, 330 U.S. 501, 508-09 (1947)). Each of those factors weighs strongly in favor of dismissal of Tradition's Complaint. Accordingly, this application should be denied.

### 1.    Chile is an adequate alternative forum as a matter of law.

To secure dismissal of an action on grounds of forum *non conveniens*, "a movant must [show that] an adequate alternative forum is available." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 157 (2d Cir. 2005). "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003).

The Foreign Defendants are Chilean residents and citizens, are amenable to process in Chile, and are subject to the jurisdiction of Chilean courts and to Chilean law. *See R. Maganlal & Co. v. M.G. Chem. Co., Inc.*, 942 F.2d 164, 167 (2d Cir. 1991) ("Ordinarily, a foreign forum will be adequate when the defendant is subject to the jurisdiction of that forum."). Tradition, likewise, is subject to Chilean law and jurisdiction. Indeed, on or about December 18—three days before this Complaint was filed—Tradition (North America) Inc. purchased the majority shares of Tradition Chile Agentes de Valores LTDA. (Sánchez Decl., ¶¶31-34 and Exhibit A).

Moreover, there is at least one related lawsuit filed against Tradition Chile by one of the Chilean Employees. On December 31, 2009, Mr. Mosqeira sued Tradition Chile in Santiago and asserted claims for relief based upon, *inter alia*, Tradition Chile's violation of the Chilean Constitution and Labor Code and Tradition Chile's failure to pay him moneys he earned before he resigned. Mr. Mosqueira also seeks a declaratory judgment that the English Contract is null and void in all respects. (Mosqueira Decl., ¶¶51-55 and Exhibit B).

Conversely, none of the Foreign Defendants are amenable to service of process in New York. Chile, therefore, is an adequate and appropriate alternative forum as a matter of law. *See Foster Wheeler Iberia S.A. v. Mapfre Empresas S.A.S.*, No. 601916/06, 2007 NY Slip Op 50619U, at 7 (N.Y. Sup. Ct. Mar. 27, 2007) (dismissing complaint where Spain and Chile were found to be more appropriate forums).

31

### 2.    Tradition's forum selection clause has no effect here.

As stated above, Tradition's forum selection clause is the product of overreaching and impermissible forum shopping and should be given no weight whatsoever.

### 3.    The private and public interest factors strongly disfavor proceeding in New York.

The third step in the forum *non conveniens* analysis is to evaluate the overall comparative convenience of the forums by considering the various private and public interest factors involved. "In considering these factors, the court is necessarily engaged in a comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." *Iragorri*, 274 F.3d at 74. Based upon the foregoing, both the private and public interest factors strongly demonstrate that litigation in New York is genuinely inconvenient and suit before the Chilean courts is significantly preferable. *See Bigio v. Coca-Cola Co.*, 448 F.3d 176, 179 (2d Cir. 2006), *cert. denied*, 549 U.S. 1281 (2007).

### a.    *The private interest factors favor disfavor litigation in New York because all documents and witnesses are located in Chile or elsewhere in Latin America and all of the relevant documents and laws are in Spanish.*

Private interest factors to be considered include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Iragorri*, 274 F.3d at 73-74 (*quoting Gulf Oil Corp. v. Gilbert*, 330 U.S. at 508).

All of the known witnesses are in Chile or elsewhere in Latin America. Indeed, Mr. Levin recognized the burden of even securing declarations to support Traditions (albeit specious)

allegations because he needed "to get down to Chile" and that "physically getting a declaration signed in Chile is extraordinarily difficult." Tr. 35:14 to 36:7. The Foreign Defendants also are unaware of witnesses with relevant information who reside in New York or anywhere else outside of Latin America. Indeed, it will take 20 hours or more for each witness to travel from Santiago to New York, at a cost of no less than $1,100 in flight expenses alone. (Saloman Decl., ¶15).

The Foreign Defendants likewise will be substantially and irreparably prejudiced if forced to defend themselves in New York without the ability to compel the attendance of the litany of witnesses that will support their defenses. *See Base Metal Trading*, 253 F. Supp. 2d at 710-11 ("In view of the plaintiffs' allegations, which themselves appear to place most of these parties in Russia, the defendants argue persuasively that almost all of their likely witnesses are located in Russia or elsewhere, and that few, if any, are in the United States. And as third-parties to this action, the Court cannot compel such witnesses appear. Moreover, even if the Court could do so, the striking number of Russian parties and witnesses involved in the case demonstrates the extreme inconvenience of bringing this case to trial in the United States.") (internal citations omitted)).

In addition, all of the relevant documents are in Spanish and the witnesses speak Spanish as their first language, providing additional support for this matter being properly venued in Chile. *See Foster Wheeler Iberia S.A. v. Mapfre Empresas S.A.S.*, 2007 NY Slip Op 50619U, at 7 (N.Y. Sup. Ct. 2007) (dismissing complaint in favor of a Spanish-speaking forum where witnesses spoke primarily Spanish and the relevant documents were all in Spanish); *Lorca, Castillo S.A.C. v Pettibone Corp.*, No. 81 C 2863, 1982 U.S. Dist. LEXIS 13480 (N.D. Ill. May 23, 1982) (in choice between U.S. and Chilean forum, preponderance of Spanish-speaking

33

witnesses, Spanish language documents, and Chilean law issues favored forum *non conveniens* dismissal).

          **b.**      ***Litigation in New York causes undue inconvenience and expense to all parties.***

      The lack of any meaningful connection between the litigation and New York strikingly confirms that proceeding with litigation 4,500 miles from Chile exponentially increases the burden on all parties to this case.  The translation of Spanish documents into English is already proving to be prohibitively expensive.  Tradition has had to retain "a specialized agency" in order to have basic company records translated into English.  Tr. 7:20-23.  SIF ICAP likewise has incurred more than $10,000 in translation costs *in less than one week* just to allow its American counsel to read the Spanish Agreement and pertinent sections of the Chilean Constitution, Labor Code, Civil Code, Procedural Rules, and applicable case law relevant to these issues. (Saloman Decl., ¶16).  This translation also takes significant time—up to 48 hours to translate one legal case into English. (Saloman Decl., ¶17).  The burden of translating the documents is an important private interest factor that also disfavors litigation in New York.  *See Blanco v. Banco Industrial de Venezuela, S.A.*, 997 F.2d 974, 982 (2d Cir. 1993) (upholding FNC dismissal, explaining, "the documentary evidence is in the Spanish language, as would be trial or deposition testimony, requiring translation to English that would result in significant cost to the parties and delay to the Court."); *Online Payment Solutions Inc. v. Svenska Handelsbanken AB*, 638 F. Supp. 2d 375, 388 (S.D.N.Y. 2009) (granting FNC motion where all documents were in Swedish, explaining, "the costs of translating much of the relevant documentary evidence would be great and further supports dismissal."); *Niv v. Hilton Hotels Corp.*, No. 06 Civ. 7839 (PKL), 2008 WL 4849334 at *12 (S.D.N.Y. Nov. 10, 2008) (finding that "the costs associated with translating the vast majority of testimony weighs in favor of dismissal" and noting that both

34

plaintiffs and defendants would be burdened with the translation costs, which would not occur if the parties pursued the litigation in the alternative foreign forum), *affirmed* 2009 WL 5064328 (2d Cir. Dec. 28, 2009).

    **4.**    **The public interest factors strongly disfavor proceeding in New York.**

Relevant public interest factors which favor dismissal here include "the local interest in having localized controversies decided at home" and avoiding difficult problems in conflict of laws and the application of foreign law." *Gilbert*, 330 U.S. at 508-09; *see also Iragorri*, 274 F.3d at 74. As stated, this case has no meaningful connection whatsoever to New York and its nexus could not be farther removed from New York. *See Murray v. BBC*, 81 F.3d 287, 293 (2d Cir. 1996) ("The crux of the matter, therefore, involves a dispute between British citizens over events that took place exclusively in the United Kingdom. . . . The United States thus has virtually no interest in resolving the truly disputed issues."); *accord Saab v. Citibank, N.A.*, No. 00 Civ. 6784, 2001 WL 1382577, at *5 (S.D.N.Y. Nov. 7, 2001) (FNC dismissal because of insufficient connection of the community to the litigation: "Although [defendant's] headquarters are in New York, the other major players in this controversy are Lebanese businessmen and a Saudi Arabian bank. The actions in dispute occurred throughout Europe and the Middle East; moreover, the witnesses are nearly all foreign."), *aff'd*, 50 Fed. App'x 469 (2d Cir. 2002).

As this controversy is entirely and deeply rooted in Chile, the Foreign Defendants have a significant interest in having this controversy decided by the Chilean courts and no American court in any jurisdiction has a similar interest in this action. *See Calavo Growers of Cal. v. Generali Belgium*, 632 F.2d 963, 967 (2d Cir. 1980), *cert. denied*, 449 U.S. 1084 (1981) (FNC dismissal granted where Belgium was "the jurisdiction most intimately concerned with the issues raised in this litigation" because "suit involves its residents" and involves contract "allegedly breached in Belgium") (citing to *Schertenleib v. Traum*, 589 F.2d 1156, 1165 (2d Cir. 1978));

*Base Metal Trading*, 253 F. Supp. 2d at 713 ("The controversy presents issues that are of clear import to Russian citizens that should be resolved by the Russian courts. By contrast, the case has virtually no connection with the United States or this district. As such, the local interest in resolution of the dispute is virtually none."); *Hasakis v. Trade Bulkers, Inc.*, 690 F. Supp. 260, 262 (S.D.N.Y. 1988) (FNC dismissal warranted where "[t]he United States has no significant connection with the action and has no interest in adjudicating the dispute between these parties.").

It is also undisputed that both the English Contracts and the Spanish Agreement are governed by Chilean law. Accordingly, "the likelihood that foreign law will apply weighs against retention of the action." *Varnelo*, 2003 U.S. Dist. LEXIS 1424, at *106 (citing *Ioannides v. Marika Mar. Corp.*, 928 F. Supp. 374, 379 (S.D.N.Y. 1996)); *accord In re Air Crash near Peixoto de Azeveda, Brazil*, 574 F. Supp. 2d 272, 289 (S.D.N.Y. 2008) (finding that the likelihood that Brazilian law governs is a public interest factor that weighs in favor of FNC dismissal); *Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 491 (S.D.N.Y. 2006) (declining to apply English law in accord with public interest factor of "having a dispute decided in a forum 'at home with the . . . law that must govern the case,'") (citing *Gilbert*, 330 U.S. at 509)); *see Calavo*, 632 F.2d at 967 (noting that "the likelihood that Belgian law would govern in turn lends weight to the conclusion that the suit should be prosecuted in that jurisdiction."); *Hasakis*, 690 F. Supp. at 262-63 (noting that courts should "decline to adjudicate essentially foreign litigation.") (citing *Cruz v. Maritime Co. of Philippines*, 549 F. Supp. 285, 290 (S.D.N.Y. 1982), *aff'd*, 702 F.2d 47 (2d Cir. 1983)). *See also Conte v. Flota Mercante del Estado*, 277 F.2d 664, 667 (2d Cir. 1960) ("try as we may to apply the foreign law as it comes to us through the lips of the experts, there is an inevitable hazard that, in those areas, perhaps interstitial but far from

36

inconsequential, where we have no clear guides, our labors, molded by our own habits of mind as they necessarily must be, may produce a result whose conformity with that of the foreign court may be greater in theory than it is in fact") (citation omitted)).

For the foregoing reasons, the private interest and public interest factors weigh strongly in favor of proceeding in Chile, not New York.

## VI. TRADITION CANNOT ESTABLISH ANY OF THE ELEMENTS NECESSARY TO OBTAIN A MANDATORY PRELIMINARY INJUNCTION

A party is entitled to a preliminary injunction only if it demonstrates: (1) a likelihood of success on the merits; (2) irreparable injury should the injunction not be granted; and (3) a balancing of the equities in its favor. *Aetna Ins. Co. v. Capasso*, 75 N.Y.2d 860, 862 (1990). Because Tradition seeks a mandatory injunction—depriving the Chilean Employees from exercising their unfettered freedom to obtain new employment in Chile with another Chilean employer—Tradition's burden is even greater: it must "clearly" show that it is entitled to relief and that "extreme or very serious damage" will result from a denial of the injunction. *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997). Tradition woefully fails to satisfy any of these elements.

### A. Tradition Cannot Demonstrate A Likelihood Of Success On The Merits Of Its Claims Because The English Contracts Are Entirely Unenforceable As A Matter Of Chilean Law.

As stated, the English Contracts are null, void, and unenforceable as a matter of Chilean law.[17] Tradition, therefore, has no chance of succeeding on its breach of contract claims, or any related tort claims against the Foreign Defendants arising from an attempt to enforce those

---

[17] We note that Tradition seeks to enjoin Chilean Employees Christian Schultz and Denise Sunnah though it appears that neither had an English Contract with Tradition; Schultz was a staff member and not a broker; and each allegation against Schultz is pled "on information and belief" and with no factual support. Compl., ¶¶ 118-121.

otherwise invalid agreements. "Indeed, it is well-settled that there can be no breach when an at-will employee resigns and finds new employment, especially for better terms." Tradition Brf. at 71. On this basis alone, Tradition's application should be rejected.

Even if the Court turns to New York law, it is axiomatic that to establish a claim for breach of contract, Tradition must prove: (1) the existence of a valid and enforceable contract; (2) performance of the contract by Tradition; (3) breach of the contract by the Chilean Employees; and (4) damages resulting from the breach. *See K. Bell & Assocs. v. Lloyd's Underwriters*, 827 F. Supp. 985, 988 (S.D.N.Y. 1993); *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F. Supp. 542, 560-561 (S.D.N.Y. 1985). Because the English Contracts are invalid and unenforceable under Chilean law, Tradition still cannot prevail on the merits of its breach of contract claim.

Purely for the sake of completeness, the English Contracts are unreasonable, overbroad, and therefore, unenforceable under New York substantive law, as well. As Tradition has forcefully argued, "[u]nder New York law, restrictive covenants in employment agreements are disfavored as an unreasonable restraint of trade":

> Undoubtedly, judicial disfavor of these covenants is provoked by "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." Indeed, our economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas. Therefore, no restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment.

Tradition Brf. at 73 (citing *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679-80 (1976) and *Purchasing Assoc. v. Weitz*, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604 (1963)). New York common law recognizes that a post-employment restraint is reasonable only if it: "(1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not

injurious to the public." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389, 712 N.E.2d 1220,

690 N.Y.S.2d 854, 857 (1999). A violation of any prong renders the covenant invalid. *Id.*

Again, the (unenforceable) English Contracts fail to meet any of the elements of this test.

> **1.    *The (unenforceable) English Contracts protect no legitimate interest of Tradition.***

New York has adopted the prevailing standard of reasonableness in determining the

validity of employee agreements not to compete and a restrictive covenant "will only be subject

to specific enforcement to the extent that it is reasonable in time and area, necessary to protect

the employer's legitimate interests, not harmful to the general public and not unreasonably

burdensome to the employee. *Id.* (citations omitted). *First*, Tradition has no legitimate interest

in stifling competition in Chile. As Tradition argued in opposition to GFI's application for

injunctive relief, the "**Alleged Loss of Customer Relationships Does Not Constitute**

**Irreparable Harm**." (Tradition Brf. at 46) (emphasis in original). Indeed:

> [Tradition]'s request for a preliminary injunction must fail because [Tradition] cannot show that it will be irreparably harmed by the loss of customer relationships. Indeed, [Tradition], itself, has admitted on numerous occasions that customer relationships in the credit derivatives market are not unique or exclusive, and that companies, such as [Tradition], have no proprietary interest in their customer relationships. Furthermore, the law is clear in New York that the loss of customers to a competitor is not sufficient to demonstrate irreparable harm. *See Ivy Mar Co., Inc. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 566 (E.D.N.Y. 1995).

*Id.* at 46. Because, according to Tradition, inter-dealer brokers have "absolutely no proprietary

interests in its customer relationships," *Id.* at 47, it cannot prove that its post-employment anti-

competition provisions are reasonable.

Moreover, the English Contracts are unlimited in geographic area and run as long as 22

month, which is plainly unreasonable. *See Columbia Ribbon & Carbon Mfg. Co., Inc. v. A-1-A*

*Corp.*, 42 N.Y.2d 496, 499 (N.Y. 1977) (restrictive covenant prohibiting employment "in the

39

United States for a period of two years" unenforceable); *Maxon v. Franklin Traffic Services, Inc.*, 261 A.D.2d 830, (N.Y. App. Div. 4th Dep't 1999) (restrictive covenant prohibiting employment within 300 miles of any office operated by plaintiff unenforceable); *Heartland Sec. Corp. v. Gerstenblatt*, No. 99 CIV 3694, 2000 WL 303274 (S.D.N.Y. Mar. 22, 2000) (restrictive covenant prohibiting employment for two years and with no geographic limit unenforceable); *Great Lakes Carbon Corp. v. Koch Industries Inc.*, 497 F.Supp. 462, 471 (S.D.N.Y. 1980) restrictive covenant prohibiting employment with "no geographical limitation whatsoever" unenforceable).

Likewise, the English Contracts are unreasonable because they interfere with the public's interest in free competition, which is favored by Chile and New York. *See* Tradition Brf. at 63 ("An injunction should not issue to aid GFI in this anticompetitive endeavor, particularly when its unabashed aim is to stifle any competition from one particular rival.") Issuance of an injunction here—in the absence of significant harm to Tradition—will "have a negative impact on the free marketplace." *Rovic v. Hanson*, No. CV599617S, 2000 WL 1624506, *5 (Conn. Super. Ct. Oct. 2, 2000); *see Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986) ("the preliminary injunction, which is one of the most drastic tools in the arsenal of judicial remedies, must be used with great care, lest the forces of the free market, which in the end should determine the merits of takeover disputes, [be] nullified.") (citing *Medical Soc. of State of N.Y. v. Toia*, 560 F.2d 535, 537 (2d Cir. 1977) ("an extraordinary and drastic remedy which should not be routinely granted")); *John Labatt Ltd. v. Onex Corp.*, 890 F.Supp. 235, 247 (S.D.N.Y. 1995) (internal citations omitted) (parties "should not use the equitable assistance afforded by injunction to insure fair and free markets. It is generally inappropriate to impede a legitimate fight for the control of the management of a corporation"); *accord Brunswick Corp. v.*

40

*Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("antitrust laws were enacted for the

protection of *competition* not *competitors*") (emphasis in original).

> **2.    The (unenforceable) English Contracts impose severe undue hardship upon the Chilean Employees.**

Though Tradition glosses over the obvious hardship to the Chilean Employees, it strongly

argued this point in justification of its GFI raid—even though GFI, unlike Tradition, continued to

pay the brokers taken by Tradition throughout the pendency of that litigation:

> GFI asserts that the Respondent Brokers will not suffer pecuniary harm if the
> injunction is granted because GFI will continue to pay them until the restrictive
> covenant periods have lapsed.   This is simply not true, as GFI knows.   GFI asks
> this Court to force the Respondent Brokers to sit on the sidelines of their chosen
> industry, while their customer relationships are destroyed and their clients are
> forced to go elsewhere, at a time when the credit derivatives market is
> undergoing unprecedented change.  The resulting harm to Respondent Brokers is
> the loss of business relationships that cannot be repaired.   As the Court has
> observed, "this is a very narrow boutique industry … and if you are not in it you
> are gone."  . . . Indeed, the Court has justly expressed its concern that Respondent
> Brokers, if temporarily enjoined pending arbitration "may not be able to get back
> into the market."  . . .  This is particularly true for the more senior, long-term
> brokers among the Respondent Brokers, who may not be marketable in other
> fields and who have over many years developed their reputations in the credit
> derivatives field.   In addition, several of the brokers are the primary or sole
> breadwinners in their families.

(Tradition Brf. at 60).  Indeed, Tradition Chile apparently has not even paid the

Chilean Employees what they legitimately earned before their respective resignations.

(Mosqueira Decl., ¶51-54 and Exh. B).   "In short, the loss of professional livelihood by the

[Chilean Employees] is of far greater impact than the easily computed loss of revenue to

[Tradition]."  *Id.* at 62. *See Am. Broadcasting Cos., Inc. v. Wolf*, 52 N.Y.2d 394, 404, 438

N.Y.S.2d 487 (1981) (in analyzing restrictive covenants, "important, too, are the powerful

considerations of public policy which militate against sanctioning the loss of a man's

livelihood") (citation omitted); *see also Bear, Stearns & Co. Inc., v. Sharon*, 550 F. Supp. 2d

174, 178 (D. Mass. 2008) (denying injunction even though broker would survive financially

where the balancing of hardships favored the departed broker, because "an injunction will likely result in a loss of professional standing and the inability to advise his clients in times of economic turmoil.  The loss from such a prohibition may not ever be fully restored."); *Scott v. General Iron & Welding Co., Inc.*, 171 Conn. 132, 137 (Conn. 1976) ("The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family.")

Here, the Chilean Employees have been working in the brokerage industry in Chile for years.  If enforced, the draconian English Contracts will bar them from working in any capacity in their chosen profession—despite the freedoms and rights afforded them under the laws of their home country.  This is a hardship no citizen of a foreign nation should be forced to endure.

B.    **Tradition Cannot Demonstrate Irreparable Injury Because, As Tradition Itself Has Stated, The "Alleged Loss Of Customer Relationships Does Not Constitute Irreparable Harm."**

As Tradition has argued, "the loss of customers to a competitor alone is not sufficient to demonstrate irreparable harm." Tradition Brf. at 47 (citing *Ivy Mar*, 907 F. Supp. at 566).

Tradition continued:

> A relationship that can be rebuilt is not "irreparably" lost.  The temporary loss of customer relationships and revenue through competition is not "irreparable harm," but a risk common to every company participating in the financial industry.  As one market analyst recently stated, "[r]aids of key brokerage personnel are common in the inner-dealer broker market."  (*See* Barr Article) (Ex. G).[18]  The contention that [the Foreign Defendants] have acted improperly to injure [Tradition] "is of course absurd . . . These companies operate in a highly competitive business; their motivation is to take money, and shifts of employees happen constantly."  *Id.*  Furthermore, specifically in this very inter-dealer industry, "[t]he case law has made it almost a subject of judicial notice that the recruiting of brokers among competing firms is a commonplace facet of the industry."

---

[18] Annexed to SIF ICAP's Appendix of Unpublished Cases.

42

Tradition Brf. at 48 (quoting *Intercapital Debt Trading Ltd. v. Cantor Fitzgerald L.P.*, 213

N.Y.I.J. at 28 (Sup. Ct. N.Y. County Mar. 9, 1995)).

      Likewise, injunctive relief is not available where a plaintiff has an adequate remedy at

law. "Damages compensable in money and capable of calculation, albeit with some difficulty,

are not irreparable." *SportsChannel Am. Assocs. v. Nat'l Hockey League*, 186 A.D.2d 417, 418,

589 N.Y.S.2d 2, 3 (1st Dep't 1992) *(*emphasis removed*); see also U.S. Re Cos. v. Scheerer*, 41

A.D.3d 152, 155, 838 N.Y.S.2d 37, 40 (1st Dep't 2007) (denying injunction where "money

damages equal to the value of the transactions lost" were a "quantifiable remedy" for defendant's

alleged breach); *Sterling Fifth Assocs. v. Carpentile Corp.*, 5 A.D.3d 328, 329, 774 N.Y.S.2d

140, 142 (1st Dep't 2004) (order unanimously reversed and preliminary injunction vacated

where "[l]ost profits and tax benefits, however difficult to compute as they may be, are clearly

compensable with money damages.")  That Tradition's Complaint specifically quantifies its

alleged loss in distinct monetary amounts for the various causes of action asserted confirms that

no irreparable harm exists. *See* Compl. at 50-51, ¶¶ 3-8. *See Cliff v. R.R.S., Inc.*, 207 A.D.2d 17,

20, 620 N.Y.S. 2d 190, 193 (3d Dep't 1994) (in denying plaintiff's request for a preliminary

injunction, the court noted that plaintiff could not establish irreparable harm where "although

plaintiff has alleged both a loss of business and customer goodwill, he has also set forth a claim

for money damages."); *accord* Tradition Brf. at 53 ("Where, as here, damages for lost revenue

can be calculated, injunctive relief simply is not available.")

      Tradition's assertion that it will be harmed because some of the Chilean Employees

deleted some text messages from their cell phones or misappropriated any confidential Tradition

property is factually wrong[19] and fatally undermined by Tradition's prior argument to the

contrary:

> There is no allegation in this case that any of the employees misappropriated
> confidential information or trade secrets, because there simply cannot be.  The
> customers of [Tradition], and others in the credit derivatives market, are
> relatively few in number . . . and they are large, well known international
> financial institutions and their identities are public, a position [Tradition] has
> taken [when it] was accused of hiring brokers from a competitor. . . .  Since this
> information is well-known in the industry, and something these employees did
> not learn by virtue of working at [Tradition], it cannot be deemed confidential or
> a trade secret.  *See, e.g.*, *Reed, Roberts*, 40 N.Y.2d at 308, 386 N.Y.S.2d at 680
> ("where the employees engaged in no wrongful conduct and the names and
> address of potential customers were readily discoverable through public sources,
> an injunction would not lie"); *ENV Services, Inc. v. Maxime, et. al.*, 10 Misc. 3d
> 1054(A), 809 N.Y.S.2d 481, 2005 N.Y. Misc. LEXIS 2690, *6 (Sup. Ct. Nassau
> County November 28, 2005) ("[t]rade secret protection will not be afforded
> where the names and addresses of the customers are readily accessible").
> Additionally, where, as here, the brokers developed their relationships before
> joining [Tradition], [Tradition] cannot argue it has a protectable interest.

Tradition Brf. at 74-75.  Indeed, the Chilean employees indicate that they established the

customer relationships in question before they arrived at Tradition.  (Mosqueira Decl., ¶¶16-21,

49-50).  *See* Tradition Brf. at 75 (citing *Precision Concepts, Inc. v. Bonsanti*, 172 A.D.2d 737,

738, 569 N.Y.S.2d 124, 125 (2d Dep't 1991); *Samuel-Rozenbaum USA, Inc. v. Felcher*, 292

A.D.2d 214, 214-15, 741 N.Y.S.2d 1, 2 (1st Dep't 2002); *Iron Mountain Information Mgmt., Inc.*

*v. Taddeo*, 455 F.Supp.2d 124, 139 (E.D.N.Y. 2006).  Under New York law, those relationships

belong to the Chilean employees, not to Tradition.

Moreover, Tradition has not demonstrated, because it cannot, that any employees took or

misappropriated any information at all.  Rather, all of Tradition's so-called confidential

information remains available to Tradition to this very day.  *See* Mosqueira Decl., ¶¶41-42.  "The

employees did not download or misappropriate any information, nor do they have any exclusive

---

[19] *See* Mosqueira Decl., ¶¶41-43, 48.

or proprietary knowledge.  They do not have anything other than their own recollections, which is not confidential."  Tradition Brf. at 75; *see Walter Karl, Inc. v. Wood*, 137 A.D.2d 22, 27, 528 N.Y.S.2d 94, 98 (2d Dep't 1988) ("an employee's recollection of information pertaining to specific needs and business habits of particular customers is not confidential"); *Prebon Fin. Prods., Inc. v. GFI Group, Inc.*, Nos. 603085/00, 115749/00, slip op. at 6 (Sup. Ct. N.Y. County Oct. 31, 2000) (an [inter-dealer broker's] knowledge of the business habits of particular customers does not constitute a trade secret").  "Without any wrongful conduct—and there is none here—an injunction must be denied."  Tradition Brf. at 76.

Finally, according to Tradition, "this is not an instance where the [Chilean Employees] provided unique or extraordinary services.  An employee's services are to be deemed 'unique or extraordinary' in this context only where it 'appear[s] that his services are of such character as to make his replacement impossible or that the loss of such services would cause the employer irreparable injury.'"  Tradition Brf. at 76 (citing *Purchasing Assocs.*, 13 N.Y.2d at 274, 246, N.Y.S.2d at 605).

C.    **The Balance Of The Equities Is One-Sided In Favor Of Denial Of Injunctive Relief.**

As stated above, the hardship faced by the Chilean Employees if they are deprived of their rights under the laws of their home country and are forced to delay working for SIF ICAP Chile for even one day clearly outweighs the wholly speculative alleged harm to Tradition.

D.    **Tradition Cannot Demonstrate A Likelihood Of Success On The Merits Of Its Claims Against SIF ICAP.**

1.    **Tradition cannot prevail on its tortious interference claims.**

In the absence of valid post-employment restraints against the Chilean Employees, the Foreign Defendants were free to solicit and hire them under Chilean law.  *See* Chilean Constitution, Chapter III, Art. 19, ¶16; Civil Code, Art. 1682; *accord* Bofill Decl., ¶¶6-7.

45

Likewise, Tradition's claim under New York law also fails because it cannot show "the existence of [a] valid contract with a third-party." *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422, 426, 835 N.Y.S.2d 530, 533 (2007); *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82 (1996). That the English Contracts are invalid under both Chilean and New York law confirms that Tradition cannot prevail on its tortious interference claim.

Moreover, there is no evidence that SIF ICAP procured the breach of the Chilean Employees' invalid agreements. That Tradition asserts—over and over—that the Chilean Employees resigned from Tradition at roughly the same time "is not enough to demonstrate that [Tradition] procured any alleged breach." Tradition Brf. at 87. *See Intercapital Debt Trading*, 213 N.Y.L.J. 28 (Col. 3) ("stigmatizing [inter-dealer brokers] as having acted 'en masse' does not erase their right to exercise their own prerogatives in the employment front. . . . [That term] is merely an inflammatory description of the common decision made by the individual employees."); *Baird, Patrick & Co., Inc. v. Maxcor Financial, Inc.*, NASD Case No. 03-7325 at 4 (N.Y. April 13, 2006) ("The mere fact that employees leave together does not make unlawful what would be lawful id they left separately."). Without a breach, there can be no tortious interference with contract claim. *See NBT Bancorp Inc. v. Fleet/Norstar Fin, Group, Inc.*, 87 N.Y.2d 614, 620-21, 641 N.Y.S.2d 581, 584 (1996); *Fusco v. Fusco*, 36 A.D.3d 589, 591, 829 N.Y.S.2d 138, 140 (2d Dep't 2007).

### 2.    Tradition cannot prevail on its unfair competition claim.

In order to succeed on its claim for unfair competition, Tradition must show that SIF ICAP "misappropriated the plaintiffs' labors, skills, expenditures, or good will and displayed some element of bad faith in doing so." *Abe's Rooms, Inc. v. Space Hunters, Inc.*, 38 A.D.3d 690, 692, 833 N.Y.S.2d 138, 140 (2d Dep't 2007) (rejecting unfair competition claim). As

46

explained above, there is no evidence that the Chilean Employees misappropriated any Tradition

trade secrets or confidential information.  To be sure, their own recollections are not confidential

and they cannot be enjoined from using their memories.  *See H. Meer Dental Supply Co. v.*

*Commission*, 269 A.D.2d 662, 664, 702 N.Y.S.2d 463, 465 (3d Dep't 2000) (employer not

entitled to preliminary injunction restraining salesman's use of its customer lists); *Prebon*, slip

op. at 6 (in similar circumstances in the inter-dealer industry, unfair competition claim will not

succeed on the merits where plaintiff fails to show any trade secrets were actually

misappropriated).

> Tradition strenuously argued this point in justifying its actions toward GFI:

>> It is well-known that this is an extremely competitive industry and employees often go from one brokerage firm to another.  For example, in a case involving the inter-dealer brokerage industry, the court explained in *Intercapital Debt Trading Limited v. Cantor Fitzgerald L.P.*, 213 B,T,K,H, 28 (Col 3):

>>> The [inter-dealer] brokerage business in general … is a highly competitive industry – in terms of customers, and in terms of employees.  Competitors, such as the parties to this litigation, wage battles for the most productive and profitable people.  In turn, the employees, who are the prize being fought for, often switch firms as they evaluate competing offers of employment.  Understandably, the employees generally will go with the employers who offer the best terms or the best prospects for advancement.

>> *Id.* The court in *Intercapital* went on to explain that plaintiff's unfair competition claim would not  succeed on the merits because defendant did nothing more than build its own department "by appealing to employees who were witnessing and experiencing plaintiffs' downfall . . . Cantor was simply acting in its interests as plaintiffs' competitor in the emerging market field – nothing more." *Id.*

>> The same is true here.  GFI's employees wanted to leave and approached Standard Credit which, in an effort to compete, offered them contracts.  There is nothing malicious or dishonest about this conduct and GFI's claim for unfair competition is factually unsupported.

47

Tradition Brf. at 89-90. "Accordingly [Tradition]'s claim for unfair competition will not succeed on the merits and injunctive relief should be denied." *Id.* at 90. *Accord* Bofill Decl., ¶¶6-7.

### 3.    Tradition cannot prevail on its federal claims.

Tradition's Complaint purports to assert claims under the Computer Fraud and Abuse Act ("CFAA") and Electronic Communications Privacy Act ("EPCA") against the Foreign Defendants. Assuming, *arguendo*, that those American laws even apply to the Foreign Defendants, there is little merit to Tradition's CFAA and EPCA claims.

As an initial matter, Tradition asserts frivolous CFAA and EPCA claims in the hope of impermissibly obtaining federal question jurisdiction. It is long-settled that "a suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682-83 (1946). Tradition's CFAA and EPCA claims are, at best, unsustainable and, at worst, vindictive bullying and intimidation of foreign citizens.

In the unlikely event that the Court finds Tradition's CFAA and EPCA claims to have been brought in good faith and not to be frivolous, Tradition's chance of success remains dubious. To succeed on a CFAA claim, Tradition must establish that the Chilean Employees accessed a protected computer "without authorization or by exceeding such authorization as was granted." *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005).[20] Yet, Tradition's own submission to the Court asserts that Chilean Employees Mosqueira and Schultz—the sole defendants who deleted text messages—had every right to do so. *See, e.g.*, Compl. at ¶¶ 44, 72. Based upon Tradition's own admission that

---

[20] Tradition does not and cannot proffer any proof of such violations by SIF ICAP.

48

Mosqueira and Schultz were permitted to use Blackberry devices and receive and delete text messages, Tradition will not be able to establish a violation of the CFAA.

With respect to the EPCA, it seems that Tradition is attempting to state a civil cause of action under § 2701 of the statute, which "prohibit[s] intentional accessing of electronic data without authorization or in excess of authorization." *Sherman & Co. v. Salton Maxim Housewares, Inc.*, 94 F. Supp. 2d 817, 820-21 (E.D. Mich. 2000); 18 U.S.C. § 2701(a). "The general purpose of the ECPA was to create a cause of action against 'computer hackers (*e.g.*, electronic trespassers).'" *Id.* (quoting *State Wide Photocopy Corp. v. Tokai Financial, Inc.*, 909 F. Supp. 137, 145 (S.D.N.Y. 1995)).

In *Sherman*, the Salton sought to amend its counterclaim to allege that its former employee, Sherman, accessed its sales data after his dismissal in order to use it for his next employer's benefit. The Court refused to allow the amendment, finding that the Salton could not state an EPCA claim because Sherman's "access to the [data in question] was in no way restricted by technical means or by any express limitation. . . . there is no violation of section 2701 for a person with authorized access to the database no matter how malicious or larcenous his intended use of that access." *Id.* at 821. The court stated in no uncertain terms that, "[w]here a party consents to another's access to its computer network, it cannot claim that such access was unauthorized." *Id.* That is exactly the case here. Indeed, Tradition emphasizes in its Complaint that Mosqueira and Schultz had unlimited access to Tradition's information. Compl., ¶¶ 44, 72. Based upon the facts presented by Tradition, its ECPA claim is unsustainable. *See also International Association of Machinists and Aerospace Workers  v. Werner-Matsuda*, 390 F. Supp. 2d 479, 497 (D. Md. 2005) (jurisdiction under ECPA lost "[b]ecause it is undisputed that

Werner-Matsuda was authorized to access [the date at issue], Plaintiff cannot state a claim for relief").

## VII. THE ENTIRELY FRIVOLOUS NATURE OF TRADITION'S APPLICATION FOR INJUNCTIVE RELIEF, ITS MISREPRESENTATIONS TO THE COURT, AND LACK OF CANDOR, WARRANT THE REIMBURSEMENT OF ALL FEES AND COSTS INCURRED BY SIF ICAP IN THE DEFENSE OF THIS ACTION

As described at length above, Tradition has wrongfully pursued this litigation in New York despite the knowledge that the Spanish Agreements must be adjudicated in Chile under Chilean law and that the Foreign Defendants did not engage in activities that could be legally restrained or enjoined in New York. Moreover, Tradition procured temporary restraints based upon misrepresentations of fact, misstatements of law, and deliberate factual omissions. Under such circumstances, this Court has the equitable power to sanction Tradition's contemptuous and shameful conduct pursuant to 28 U.S.C. § 1927.

As amply demonstrated above, the Foreign Defendants were improperly sued in New York and temporary restraints were entered based on false statements and frivolous arguments. Accordingly, the Foreign Defendants respectfully request that the Court award them counsel fees and costs associated with their defense of Tradition's baseless applications. *See* Tr. 28:7-9.

## **CONCLUSION**

Based upon the foregoing, SIF ICAP, S.A. de C.V. and SIF ICAP Chile S.A. respectfully request that the application for injunctive relief brought by Tradition Chile Agentes de Valores LTDA and Tradition (North America) Inc. be dismissed and that the Court award all fees, costs, and other relief to SIF ICAP, S.A. de C.V. and SIF ICAP Chile S.A. as it deems equitable and just.

Proskauer Rose LLP

Dated: January 4, 2010

/s/ *John P. Barry*
John P. Barry
Howard Robbins
Mark A. Saloman
For the Firm

51