# 1



LEXSEE 1997 U.S. DIST. LEXIS 1092

**ARGONAUT PARTNERSHIP, L.P., GERSTENHABER INVESTMENTS, L.P., and GABRIEL CAPITAL, L.P., Plaintiffs, -against- BANKERS TRUSTEE COMPANY LIMITED, Defendants. ARGONANAUT PARTNERSHIP L.P., GABRIEL CAPITAL, L.P. and GERSTENHABER INVESTMENTS, L.P., Plaintiffs, -against- BANCOMER, S.A., Defendants.**

**96 Civ. 1970 (MBM), 96 Civ. 2222 (MBM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1997 U.S. Dist. LEXIS 1092**

**February 4, 1997, Decided**
**February 4, 1997, FILED**

**DISPOSITION:** [*1] Defendant Bancomer's motion to dismiss for lack of ripeness and standing and on the basis of forum non conveniens denied and Bankers Trustee's motion to dismiss for lack of ripeness and standing denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investors filed suit against defendant Mexican corporation and receivables trustees in the United States District Court for the Southern District of New York for breach of contract, negligence, breach of implied duty of good faith, and breach of fiduciary duty. Both defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and defendant Mexican corporation moved to dismiss also on the basis of forum non conveniens.

**OVERVIEW:** Plaintiff investors' suit against defendant Mexican corporation and receivables trustees alleged breach of contract, negligence, breach of implied duty of good faith and fair dealing, and breach of fiduciary duty. Both defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) but the court denied the motion. The court found the matter was ripe for adjudication upon breach of the contract and fit for review because plaintiffs sued for damages caused by breaches of defendants' obligations as trustees. The court also denied defendant Mexican corporation's motion to dismiss on the basis of forum non conveniens in which defendant argued the forum should have been Mexico. The court denied the motion because it found that the trust agreement's forum selection clause was mandatory and required that any action be brought in plaintiff's choice of Mexico or New York and because defendant failed to demonstrate that it was unreasonable and unjust to enforce the clause and allow the matter to continue in New York.

**OUTCOME:** The court denied defendant Mexican corporation and receivables trustees' motions to dismiss plaintiff investors' suit against them on the basis of ripeness or forum non conveniens.

**COUNSEL:** APPEARANCES:

For Plaintiffs: HECTOR TORRES, ESQ., ERIC LAUMANN, ESQ., KIMBERLY M. MACK ROSENBERG, ESQ., CYNTHIA M. SPIETH, ESQ., Kasowitz Benson Torres & Friedman, New York, New York.

For Bancomer, Defendant: RICHARD P. SWANSON, ESQ., CHRISTOPHER CONNOLLY, ESQ., JOSEFA SICARD-MIRABAL, ESQ., BRENDAN M. CONNELL, JR., ESQ., Reid & Priest, New York, New York.
For Bankers Trustee, Defendant: JOHN PRITCHARD, ESQ., Winthrop Stimson Putnam & Roberts, New York, New York. JACK H. WEINER, ESQ., Bankers Trust, New York, New York.

**JUDGES:** Michael B. Mukasey, U.S. District Judge

**OPINION BY:** Michael B. Mukasey

**OPINION**

OPINION AND ORDER

MICHAEL B. MUKASEY, U.S.D.J.

Plaintiffs Argonaut Partnership L.P. ("Argonaut"), Gabriel Capital, L.P. ("Gabriel"), and Gerstenhaber Investments, L.P. ("Gerstenhaber"), holders of notes issued by a Mexican corporation, sue Bancomer, S.A. and Bankers Trustee Limited Company ("Bankers Trustee") [1], the trustees of the collateral securing those notes, alleging [*2] breach of contract, negligence, breach of implied duty of good faith and fair dealing, and breach of fiduciary duty. Defendants Bancomer and Bankers Trustee move to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Bancomer moves also to dismiss on the basis of *forum non conveniens*. For the reasons set forth below, defendants' motions are denied.

1 These actions were filed separately, but were consolidated.

I.

A. *Sidek's Debt Offering*

These cases arise out of a debt offering by Grupo Sidek, S.A. de C.V.. Sidek is a Mexican corporation with its principal place of business in Guadalajara, Mexico. (Bankers Trustee Compl. [2] P 5) Its principal businesses are large-scale real estate development and steel and aluminum production. (*Id.*) Sidek sells real property through its subsidiaries in installment contracts. Pursuant to the installment contracts, the customers issue promissory notes (the "receivables") naming the particular Sidek subsidiary as the payee. Title to the property [*3] is held in a "property trust" until the note is fully paid. (Bancomer Compl. PP 12-13)

2 I will refer to the complaint against Bankers Trustee as the Bankers Trustee complaint and the complaint against Bancomer as the Bancomer complaint.

Sidek's subsidiaries financed these real estate developments by assigning the right to the principal and interest payments to a separate corporation created by Sidek, the Third Mexican Acceptance Corporation ("3MAC"). (Bankers Trustee Compl. P 11) In or about April, 1993, 3MAC financed its obligations to the Sidek subsidiaries by issuing debt securities secured by these receivables. (*Id.* P 12-13) 3MAC's debt offering consisted of $ 50 million in Class A guaranteed, securitized notes, maturing in 1998 (the "Class A Notes"), and $ 25 million in Class B guaranteed, securitized and subordinated notes maturing in 1998 (the "Class B Notes"). [3] In addition to using the receivables as collateral for the debt, 3MAC intended to use the interest and principal payments on the receivables [*4] to pay the interest and principal on the Notes as they became due. (*Id.* P 13) 3MAC used the proceeds from the sale of the Class A and B Notes to pay Sidek's subsidiaries for the assignment of the receivables. (*Id.*)

3 These cases are related to *Argonaut Partnership L.P.* v. *Grupo Sidek*, 96 Civ. 1967. That case, brought by the same plaintiffs, involved a put on the Class B Notes created at the time the Notes were issued, exercisable in March, 1996. I granted plaintiffs a summary judgment in that case in an Opinion and Order dated October 24, 1996. 1996 WL 671335 (S.D.N.Y. October 24, 1996).

The Notes were guaranteed by Sidek and several other entities. Sidek guaranteed payment of all principal and interest on both classes of Notes, but their guaranty of the Class B Notes was fully subordinated to their guaranty of the Class A Notes. (Indenture, § 4.06) If Sidek failed to perform on its guaranty, Nacional Financiera, S.N.C. ("NAFIN") guaranteed payment of principal and interest on the Class A Notes [*5] (*Id.*, § 4.07), and Grupo Situr, a Sidek subsidiary, guaranteed payment of principal and interest on the Class B Notes. (*Id.*, § 4.08)

B. *The Agreements Governing the Debt Offering*

As part of Sidek's debt offering, Bancomer served as receivables trustee -- *i.e.*, it maintained possession of the receivables as trustee. (Bancomer Compl. P 20) Bankers Trustee functioned as the Indenture trustee -- *i.e.*, it received the principal and interest payments from Bancomer and distributed these funds to the Noteholders. (Bancomer Mem. at 2)

Several agreements formalized the parties' rights and obligations under the debt offerings. The first agreement, the Beneficiary Designation Agreement, sets the terms of the assignment of the receivables from the Sidek subsidiaries to 3MAC.

The second agreement, the Trust Agreement, is signed by Bancomer as trustee, 3MAC as beneficiary, and Sidek's subsidiaries as trust-founders. It names 3MAC as Beneficiary and Bankers Trustee as Beneficiary in Warranty, "as Fiduciary in the [Indenture] and in representation of all of the parties listed as beneficiaries in said Agreement." (Trust Agreement, § 4) Its purpose is to assure that the [*6] receivables trustee, Bancomer, acquires and maintains the receivables during

the term of the Agreement, "to the exclusive benefit of the Beneficiary . . . and, to the degree foreseen in the previously cited [Indenture,] to the benefit of the Beneficiary in Warranty." (*Id.*, § 5) Finally, the Agreement states that Mexican law governs its interpretation; it selects New York or Guadalajara, Mexico, at the choice of the plaintiff, as forum for any litigation arising from the Agreement. (*Id.*, § 19)

The third agreement governing the conditions of the debt offering is the Indenture, dated April 23, 1996. The parties to the Indenture are: 3MAC as issuer; Sidek, Grupo Situr and NAFIN, guarantors; Bankers Trustee, trustee; Bankers Trust Company, London Branch, principal paying agent; Bankers Trust Company, registrar. Bancomer is not a party to the Indenture. The Indenture names the Noteholders specifically as beneficiaries. (Indenture at 2)

The Indenture provides that the payments of interest and principal by obligors on the receivables will be transferred into Interest and Principal Accounts maintained by Bankers Trustee. (*Id.*, §§ 3.04, 3.05) The Indenture states that this [*7] interest and principal will be applied to pay Class A and B Notes in conformity with the payment priority scheme set forth in the Indenture. (*Id.*, § 3.11) Under this scheme, payment of interest and principal on Class B Notes is subordinated to other categories of payments, including payment of all accrued principal and interest on Class A Notes. (*Id.*) Also, any funds Bancomer collects from liquidating the collateral must be applied in accordance with a separate priority scheme, which also provides for payment of Class A Notes prior to Class B Notes. (*Id.*, § 6.08) Finally, the Indenture provides that it will be governed by New York law and contains a forum selection clause designating the Southern District of New York as the venue for litigation. (*Id.*, § 15.08(b))

C. *Substitution of Receivables*

The three agreements provide for the substitution of receivables by Sidek or its subsidiaries for those originally assigned to 3MAC, and for the trustees' release of the receivables upon full repayment or repurchase of them by Sidek or its subsidiaries. The agreements require that certain conditions be satisfied before substitution or release of the receivables is [*8] permitted. (Trust Agreement, §§ 7,8; Beneficiary Designation Agreement, § 9; Indenture § 3.13) These conditions ensure that the receivables, which both provide the income stream for the payment of the Notes and secure the Notes, are not replaced with less valuable receivables. (Bancomer Compl. P 16) The Indenture provides that Bankers Trustee "shall not be responsible for determining whether a Receivable (including a Substitute Receivable) is an eligible Receivable" (*id.*, § 3.13(d)), but "shall be under a duty to examine the [certifications it is obligated to receive under the Indenture] to determine whether or not [the certifications] conform to the requirements of this Indenture." (*Id.*, § 8.01(d)(ii)) In addition, the Indenture frees Bankers Trustee from liability for actions taken in good faith. (*Id.*, § 8.02(e))

D. *Plaintiffs' Purchase of the Class B Notes and Requests for Information from Defendants Regarding Substituted Receivables*

Argonaut and Gerstenhaber are Delaware investment partnerships with their principal place of business in New York. (Bankers Trustee Compl. PP 1, 3) Gabriel is a Delaware limited partnership with its principal place of [*9] business in New York. (*Id.* P 2) All are holders of Class B Notes; together, they hold $ 20,670,000 in aggregate principal amount of Class B Notes. (*Id.* P 12) Plaintiffs purchased these Notes at a deep discount from their face value -- between 60% and 75% of par value. *See Argonaut Partnership L.P.*, 1996 WL 617335, at *2. Plaintiffs' rights in the Notes derive from assignment notices dated July 26, 1995, August 28, 1995 and September 27, 1995. (*Id.*) Sidek and plaintiffs are signatories of and parties to the assignment notices. (*Id.*)

On November 15, 1995, December 18, 1995 and February 23, 1996, plaintiffs requested information from Bankers Trustee regarding the receivables in the 3MAC collateral pool. They requested evidence that Bankers Trustee had complied with the substitution requirements, including: 1) an amended list of the receivables held by the trustees as collateral, 2) the certifications from 3MAC's accountants and General Counsel required by the Indenture before a receivable is substituted, 3) verification that the principal amount of any substituted receivable was at least equal to the principal amount of the receivable for which it is substituted, [*10] and 4) an accounting of the delinquency status of all receivables. (Bankers Trustee Compl. P 25) In its February 23, 1996 letter, Gabriel stated that Bankers Trustee's failure to respond to its request for information would constitute an admission by Bankers Trustee that it had failed to perform its duties under the Indenture. Bankers Trustee did not respond to these requests. (Pl. Mem. at 10)

Plaintiffs filed suit against Bankers Trustee on March 18, 1996 and against Bancomer on March 27, 1996. Plaintiffs allege that Bancomer failed in its obligations as receivables trustee by permitting Sidek to substitute receivables without first receiving the required certifications from Sidek or its subsidiaries, or from Bankers Trustee, as required by the agreements. Plaintiffs allege that Bankers Trustee also failed to obtain required certifications in connection with the substitution of receivables and improperly released receivables without ensuring that the underlying debt had been paid.

(Bankers Trustee Compl. P 28) As to both defendants, plaintiffs allege breach of contract, breach of implied covenant of good faith and fair dealing, negligence and gross negligence, and breach of fiduciary [*11] duties. Thus, the crux of the complaints is that defendants failed to follow the required formalities before permitting Sidek to substitute new receivables for old.

Plaintiffs allege that 3MAC defaulted on the March 15, 1996 and September 15, 1996 interest payments on the Class B Notes. [4] (Pl. 12/4/96 Mem. at 7 & n.4) They claim that defendants' failure to follow the required formalities in the release and substitution of receivables caused these defaults and led to impairment of the collateral. (Pl. 12/4/96 Mem. at 7) 3MAC defaulted also on the Class A Notes' March and September interest payments, as did the first guarantor, Sidek. However, these two interest payments were actually made by NAFIN, the second guarantor. (Bancomer 12/12/96 Mem. at 3; Bankers Trustee 12/13/96 Mem. at 4-5; Pl. 12/4/96 Mem. at 7 n.5)

4 Although these defaults were not alleged in the complaint, plaintiffs have represented that these facts will be alleged in amended complaints to be filed in both actions, with leave of court. For the purposes of these motions, I will consider these representations to be part of the complaint and direct plaintiffs to file such an amended complaint forthwith.

[*12] Defendants move to dismiss the complaint. Defendant Bancomer moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6), arguing that: 1) the action is not ripe for adjudication; 2) plaintiffs lack standing under Mexican law to sue Bancomer for breach of the Trust Agreement; and 3) the action should be dismissed on *forum non conveniens* grounds. Defendant Bankers Trustee moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6), arguing that the action is not ripe for adjudication and that plaintiffs, as Class B Noteholders, lack standing to sue because of the Indenture's subordination provisions.

II.

Both Defendants argue first that this action must be dismissed because it is not ripe for adjudication. They claim that the Notes are not in default under the terms of the Indenture, even though the Class B Noteholders have not received the past two interest payments, and that the principal on the Notes is not due until 1998. Until a default occurs, defendants argue, this action is not ripe for adjudication.

[HN1] The ripeness doctrine "prevent[s] the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas* v. *Union* [*13] *Carbide Agric. Prods. Co.*, 473 U.S. 568, 580, 87 L. Ed. 2d 409, 105 S. Ct. 3325 (1985). A case is ripe when its viability does not depend upon "uncertain and contingent future events that may not occur as anticipated, or indeed may not occur at all." *AMSAT Cable Ltd.* v. *Cablevision of Conn. Ltd. Partnership*, 6 F.3d 867, 872 (2d Cir. 1993) (quotations omitted). "In determining whether a matter is ripe for decision, we look, first, to whether the issue is fit for review and second, to the hardship to the parties of withholding review." *Id.* An issue is fit for review where a present case or controversy exists between the parties. *See, e.g., Cedars-Sinai Medical Ctr.* v. *Watkins*, 11 F.3d 1573, 1580 (Fed. Cir. 1993), *cert. denied*, 129 L. Ed. 2d 859, 114 S. Ct. 2738 (1994).

This action meets the first prong of the ripeness inquiry: it is now fit for review because plaintiffs' claim has accrued and its viability does not depend upon the occurrence of any contingent event. Plaintiffs sue defendants for breach of the Trust Agreement and the Indenture. [5] [HN2] New York law provides that "since nominal damages are always available in breach of contract actions, all [*14] of the elements necessary to maintain a lawsuit and obtain relief in court [are] present at the time of the alleged breach." *Ely-Cruikshank Co.* v. *Bank of Montreal*, 81 N.Y.2d 399, 402, 599 N.Y.S.2d 501, 503, 615 N.E.2d 985 (1993) (citations omitted). A breach of contract case, therefore, is ripe immediately upon the breach, even where damages remain uncertain. *See also LNC Invs., Inc.* v. *First Fidelity Bank*, No. 92 Civ. 7584, 1994 WL 73648, at *5 (S.D.N.Y. March 3, 1994) ("Here, plaintiffs sue [the indenture trustees] for failing to comply with a term of the Indenture which required defendants to act prudently. Because the Indenture is a contract governed by New York law, the uncertainty of the damages requested by plaintiffs does not preclude plaintiffs from bringing this action."). Plaintiffs allege that defendants breached the agreements by failing to follow the prescribed substitution procedures. Consequently, the viability of plaintiffs' breach of contract action does not depend upon any future event, a case or controversy exists, and this action is currently fit for review.

5 [HN3] An indenture is a contract, and the duties and obligations of an indenture trustee are "exclusively defined by the terms of the indenture agreement." *Meckel* v. *Continental Resources Co.*, 758 F.2d 811, 816 (2d Cir. 1985); *see also Hazzard* v. *Chase Nat'l Bank*, 159 Misc. 57, 287 N.Y.S. 541, 567 (Sup. Ct. New York County 1936), *aff'd*, 257 A.D. 950, 14 N.Y.S.2d 147 (1st Dep't 1939), *aff'd*, 282 N.Y. 652, 26 N.E.2d 801, *cert. denied*, 311 U.S. 708, 85 L. Ed. 460, 61 S. Ct. 319 (1940). Moreover, the Indenture provides

that "unless an Event of Default . . . shall have occurred and be continuing, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Indenture . . . and no implied covenants or obligations shall be read into this indenture against the Trustee." (Indenture, § 8.01(d)(i)) Thus, plaintiffs' action against Bankers Trustee is essentially a breach of contract action.

[*15] Even if plaintiffs' breach of contract claims do not accrue and become fit for review until damages are certain, plaintiffs have alleged damages that can be ascertained with sufficient certainty to meet the ripeness threshold. Defendants rely on *Cruden* v. *Bank of New York*, 957 F.2d 961 (2d Cir. 1992), to argue that this action is not ripe. In *Cruden*, the Second Circuit held that an action against indenture trustees for breach of the indenture accrued in 1983 when the issuers defaulted on the convertible debentures, rather than in 1973 when the alleged breach by the trustees occurred. *Id.* at 968-69. The Court reasoned that the debenture holders would have had no remedy had they sued in 1973 because: 1) money damages could not be ascertained in 1973 as there had been no default in the principal or interest payments at that time; and 2) equitable relief was unavailable in 1973 because a "no action" clause in the indenture precluded suit against the issuer before default and the issuer was an indispensable party to any equitable action involving the debentures. *Id.* at 968-69. Thus, the *Cruden* court held that the breach of contract action did not accrue until damages [*16] were ascertainable *or* equitable relief was available.

Unlike the plaintiffs in *Cruden*, these plaintiffs have alleged tangible injuries resulting from defendants' alleged breaches and the damages resulting from these injuries should be reasonably ascertainable. First, plaintiffs have alleged a default in the interest payments on Class B Notes. Although the Notes are not due until 1998, 3MAC is obligated to make interest payments on the Notes on a regular basis. As already pointed out, 3MAC defaulted on the March 15, 1996 and September 15, 1996 interest payments on the Class B Notes. (Pl. 12/4/96 Mem. at 7 & n.4) Moreover, plaintiffs allege that defendants' breaches at least partially caused these defaults. They claim that defendants' failure to follow the proper substitution procedures allowed Sidek to substitute receivables that decreased the total value of the receivables. Because the receivables provide the income stream for the interest payments, a decrease in the cash flow from these receivables may have caused the interest payment defaults. In addition, the effect that defendants' breaches had on 3MAC's default should be readily ascertainable. [6]

6 Defendants argue that an accounting firm it hired to investigate the impairment of the collateral resulting from the substitution of receivables found little or no connection between diminution in the value of the collateral and 3MAC's defaults in interest payments. However, this Rule 12(b)(1) motion is a "facial" attack on the pleadings; defendants merely refer to this accountants' report without submitting it or offering other evidence countering plaintiffs' allegations. Therefore, plaintiffs' facially plausible allegations of a connection between defendants' alleged breaches and the interest payment defaults must be taken as true. *See, e.g., Cedars-Sinai Medical Ctr.*, 11 F.3d at 1583. Moreover, defendants' reliance on this accounting firm's study shows that they believe that the damages resulting from the alleged breaches are at least measurable.

[*17] Second, plaintiffs allege also that they have been injured by defendants' breaches because the receivables function as collateral for the Class B Notes and a decrease in the value of the collateral damages the Noteholders. In analogous circumstances, New York law permits an action against the protector or trustee of collateral if the secured party claims that the collateral was impaired by the trustees' actions. *See, e.g., Travelers Ins. Co.* v. *633 Third Assoc.*, 14 F.3d 114, 120 (2d Cir. 1994) ("New York courts recognize a cause of action for waste by a mortgagee against a mortgagor who impairs the mortgage."); *Beck* v. *Manufacturers Hanover Trust Co.*, 125 Misc. 2d 771, 481 N.Y.S.2d 211, 218 (Sup. Ct. New York County 1984), *aff'd*, 111 A.D.2d 601 (1st Dep't 1985). Any decrease in the value of the collateral also should be reasonably ascertainable. Thus, this case is distinguishable from *Cruden*, where the plaintiffs had not alleged any tangible and readily ascertainable damages resulting from defendants' breaches. [7]

7 In addition to their breach of contract claims, plaintiffs allege negligence, breach of fiduciary duty and breach of the implied duty of good faith and fair dealing. These claims are ripe for the same reasons as the breach of contract claims and I therefore need not address them specifically.

[*18] Defendants make several other arguments in support of their claim that this action is not yet ripe. First, defendants argue that this is essentially an action for repayment of debt, and that under New York law, such actions are not ripe until the debt is due. Here, the principal payments on the Notes are not due until 1998. Allowing the case to proceed, according to defendants, would result in the trustees making plaintiffs whole before the obligors or guarantors are required to pay the

fore the obligors or guarantors are required to pay the underlying debt.

Plaintiffs do not seek repayment of debt, because they do not seek the interest and principal on the Notes. Rather, they sue the trustees for breaches under the Trust Agreement and Indenture. They seek damages resulting from those breaches, which may or may not be equal to the interest payments. Any recovery will be independent of the issuer's obligation to pay interest and principal on the Notes. Therefore, the cases defendants rely on, *see Leibowitz* v. *County Trust Co.*, 19 A.D.2d 843, 244 N.Y.S.2d 599 (2d Dep't 1963) and *Settle* v. *Saunders*, 15 Misc. 2d 1084, 181 N.Y.S.2d 820 (Sup. Ct. Richmond County 1958), are distinguishable because those cases involved suits [*19] for the repayment of future debts, not for breaches of duties that should have been performed already.

Second, defendants argue that the "no action" clause in the Indenture bars suit against them at this time. [8] However, this argument ignores the express terms of the Indenture. The Indenture's "no action" clause provides:

> No Holder shall be entitled to institute proceedings or take any other action directly against the Company, Sidek, Situr, NAFIN, or the Sidek Subsidiaries, or against any Pledged Property securing the Notes, unless the Trustee, having become bound so to proceed, fails to take proceedings against the Company or with respect to any such Pledged Property within a reasonable time and such failure is continuing.

(Indenture, § 6.06) If the trustee is not compelled by the terms of the Indenture to bring suit against the issuer to enforce the Noteholders' rights, the "no action" clause bars the Noteholders from bringing suit themselves against the issuer, the guarantors, or the pledged property. The "no action" clause does not bar suit by the Noteholders against the trustees. In *Cruden*, the Second Circuit interpreted an even broader "no action" clause [*20] to permit suit against the trustees. *Cruden*, 957 F.2d at 968. There, the "no action" clause stated that the noteholder would not have "any right to . . . institute any action" unless certain conditions were met, and did not narrow this limitation to actions against the issuer. *Id.* at 967-68. Nevertheless, the Second Circuit found that the clause did not bar suit by the noteholders against the trustees even if the conditions were not met.

8 Although both defendants have so argued, Bankers Trustee is the only defendant that was a party to the Indenture and which may be protected by its provisions.

Here, moreover, the Indenture expressly permits suit against the trustees. It states, "No provision of this Indenture shall be construed to relieve the Trustee . . . from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct." (Indenture, § 8.01(d)) The Indenture provides also that "every remedy given hereunder to the Trustee, NAFIN or to any of the Holders of [*21] the Notes shall not be exclusive of any other remedy or remedies." (Indenture, § 6.10) Thus, the "no action" clause does not bar this suit against the defendant trustees.

Third, defendants argue that this action is not ripe because it would effectively permit plaintiffs to circumvent those clauses of the Indenture which render payments to the Class B Noteholders subordinate to payments to the Class A Noteholders and to NAFIN, the Class A Notes' guarantor. Defendants argue that plaintiffs must wait until the Class A Noteholders and NAFIN are paid fully before commencing an action against the trustees.

However, plaintiffs do not seek payment of interest or principal on the Notes out of the Principal or Interest Accounts; rather, plaintiffs are suing defendants for breach of defendants' obligations as trustees, and seek damages caused by these breaches. Any damages will come out of the trustees' pockets, not those accounts or any other part of the trust estate. [9] Defendants cite no case which holds that damages for breaches by trustees that caused a default in the interest payments or impairment of the collateral must be paid from the proceeds of the collateral. In fact, permitting [*22] the trustee to pay damages out of the trust estate would make no sense; that would punish the beneficiaries for the sins of the trustees and would not deter trustee misconduct. Thus, this case is distinguishable from cases like *Jackson Nat'l Life Ins. Co.* v. *Ladish Co.*, No. 92 Civ. 9358, 1993 WL 43373, at *8 (S.D.N.Y. Feb. 18, 1993), where the Court held that the subordination provisions barred junior creditors from bringing suit against the issuer or debtor when the senior debt was still outstanding. [10]

9 It is important to note that the subordination provisions may have a role in determining the damages actually caused by defendants' breaches. If the subordination would have resulted in default in the Class B Notes notwithstanding the breaches, then the damages will likely by minimal.

10 Even if the subordination provisions are interpreted more broadly to prevent the Class B Noteholders from taking any actions to the detriment of Class A Noteholders, this action is

> not to the detriment of Class A Noteholders. Nothing precludes the Class A Noteholders from suing in a different proceeding if they have been injured by defendants' alleged breaches, and any recovery by plaintiffs will not reduce the recovery available to the Class A Noteholders. The Class B Noteholders may recover only the damages they have sustained. Moreover, if any recovery would in fact affect the rights of Class A Noteholders, the court could craft a remedy that would protect those rights.

[*23] The second prong of the ripeness inquiry -- hardship to the parties from withholding review -- also favors plaintiff. Accepting plaintiffs' allegations as true, defendants' breaches caused 3MAC to default on interest payments and impaired the collateral securing the Notes. Permitting suit at this stage might help avoid future defaults on interest payments. Moreover, diminution of the collateral securing the Notes affects the resale value of the Notes. If plaintiffs try to sell the Notes, that could cause immediate, rather than future damages. In addition, allowing Noteholders to sue immediately for impairment of collateral might stop continuing impairment and prevent more extensive damages. Accordingly, this action is ripe for adjudication.

III.

Relatedly, Bankers Trustee argues that plaintiffs lack standing to bring these claims. [HN4] The constitutional minima for standing are: 1) the litigant suffered a personal injury; 2) the injury can be traced to the action challenged; and 3) the injury is likely to be redressed by the requested relief. *See Comer* v. *Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994). Bankers Trustee does not contest seriously that plaintiffs have alleged facts [*24] sufficient to meet the second requirement. Rather, Bankers Trustee claims that plaintiffs failed to meet the first requirement -- *i.e.*, that plaintiffs have suffered no personal injury. Bankers Trustee intimates that this case is similar to *Bluebird Partners L.P.* v. *First Fidelity Bank, N.A.*, 85 F.3d 970 (2d Cir. 1996), where the Second Circuit held that a bondholder that had acquired the bonds after the alleged breaches by the trustees lacked standing to assert a claim under the Trust Indenture Act. However, that case is distinguishable. First, in *Bluebird*, it was undisputed that plaintiffs had purchased the bonds after the acts that formed the basis of the complaint took place. Here, Bankers Trustee does allege any facts showing that plaintiffs purchased the Class B Notes after all alleged breaches had occurred and thus suffered no damages. Bankers Trustee claims only that plaintiffs purchased the Notes two years after the Indenture was signed. (Bankers Trustee Reply Mem. at 10) This fact, however, does not mean that plaintiffs did not acquire the Notes before some receivables were substituted without the proper procedures. Second, *Bluebird* applied federal law [*25] to a claim under the Trust Indenture Act. Here, plaintiffs have asserted state law claims and thus *Bluebird* does not apply.

Bankers Trustee argues also that plaintiffs fail to meet the third standing requirement because they are not entitled to the relief they request in light of the Indenture's subordination provisions. This argument fails for the same reasons that the ripeness argument fails -- *i.e.*, the subordination provisions do not bar damage payments by the trustee from its own funds, and any damages paid to the Class B Noteholders will not violate the spirit of those subordination provisions.

In addition, Bankers Trustee has not alleged that any of the court-imposed prudential limits on invoking federal jurisdiction preclude this suit. *See Golden Hill Paugussett Tribe of Indians* v. *Weicker*, 39 F.3d 51, 58 (2d Cir. 1994). Plaintiffs have standing to sue Bankers Trustee.

IV.

Bancomer contends next that under Mexican law, which it asserts governs the Trust Agreement, because plaintiffs were not parties to the Trust Agreement, the only agreement Bancomer signed, and were not designated expressly as third-party beneficiaries to that Agreement, they cannot [*26] assert a breach of contract claim against Bancomer. Bancomer's argument fails for two reasons: first because even if only parties designated specifically as third-party beneficiaries may sue on a contract under Mexican law, plaintiffs are so designated in the Trust Agreement, and second, because Mexican law permits intended as well as express third-party beneficiaries to enforce a contract, and plaintiffs are intended third-party beneficiaries.

The Trust Agreement provides that Mexican law governs its interpretation. (Trust Agreement, § 19) Under New York choice of la w rules, which govern this diversity action, *see Klaxon Co.* v. *Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941), the choice of law provision in the Trust Agreement will be enforced provided that the chosen law bears a "reasonable relationship" to the contract, *Nacional Financiera, S.N.C.* v. *American Airlease, Inc.*, 803 F. Supp. 886, 892 (S.D.N.Y. 1992); *see also International Minerals and Resources, S.A.* v. *Pappas*, 96 F.3d 586, 592 (2d Cir. 1996) ("New York law is unambiguous in the area of express choice of law provisions in a contract. . . . Absent [*27] fraud or violation of public policy, contractual selection of governing law is generally determinative so long as that State selected has sufficient contacts with the

transaction.") (quotations and citations omitted). Here, the contract was executed in Mexico; Bancomer, the issuer and the guarantors are Mexican companies; the Trust Agreement governs a trust which includes receivables from contracts entered into in Mexico; and most of the obligations under the contract were to be performed in Mexico. There can be little question that there is a reasonable relationship between Mexico and the Trust Agreement. [11]

11 Plaintiffs in a footnote seem to leave open the possibility that Mexican law does not govern the Trust Agreement. (Pl. Mem. at 14 n.23) However, they fail to argue which law actually does apply, and submit evidence and argument regarding Mexican law only. Thus, they have effectively conceded that Mexican law applies. *See Tehran-Berkeley Civil and Envtl. Eng'rs* v. *Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989).

[*28] Bancomer asserts that under Mexican law, only parties or express third-party beneficiaries to a contract may sue for breach of that contract, and presents the affidavit of Claus Von Wobeser, a purported expert on Mexican law. Von Wobeser opines that "in order for a third party to be considered as a beneficiary under a contract, such third party must be specifically designated as a beneficiary. Under Mexican law, there are only expressed third party beneficiaries, and not intended beneficiaries." (Von Wobeser Aff. at 5) Thus, he states that plaintiffs, because they are not specifically designated in the Trust Agreement as beneficiaries, are not third-party beneficiaries to the Trust Agreement and thus may not sue for breach of that agreement. In addition, Von Wobeser asserts that because their breach of contract claim fails, plaintiffs may not proceed on their remaining causes of action under Mexican law.

Manuel Vera-Vallejo, plaintiffs' expert in Mexican law, does not contradict Von Wobeser's version of substantive Mexican law. Rather, Vera-Vallejo opines that under Mexican procedural law, issues of standing are resolved at the same time as the resolution of the merits of the case, [*29] *i.e.*, at the conclusion of the case. He argues that plaintiffs have a right to sue under Mexican law because they have a legal interest in the contract, but he does not discuss whether a Mexican court would eventually find that plaintiffs had standing to sue under the Trust Agreement.

Vera-Vallejo's conclusions are irrelevant because federal procedural law governs this diversity action and Mexican procedural law is inapplicable. *See, e.g., Hanna* v. *Plumer*, 380 U.S. 460, 465, 14 L. Ed. 2d 8, 85 S. Ct. 1136 (1965). [HN5] Under federal procedural law, lack of standing may be raised in a motion to dismiss for failure to state a claim. The relevant question, then, is not what Mexican courts might do procedurally at this stage of the litigation, but whether Mexican law would find ultimately that plaintiffs have standing to sue defendants for breach of the Trust Agreement. Von Wobeser's views, therefore, remain uncontradicted.

However, Von Wobeser's affidavit is insufficient. The resolution of foreign law issues is governed by Fed. R. Civ. P. 44.1, which states:

> The court, in determining foreign law, may consider any relevant material or source, including testimony, [*30] whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination should be treated as a ruling on a question of law.

Under this rule, [HN6] a court need not slavishly accept a party's sworn affidavit on foreign law, even if it is uncontroverted. *See, e.g., Twohy* v. *First Nat'l Bank of Chicago*, 758 F.2d 1185, 1192-93 (7th Cir. 1985). Instead, a court "may wish to reexamine and amplify material that has been presented by counsel in partisan fashion or in insufficient detail." Fed. R. Civ. P. 44.1, Advisory Committee Notes. A court may reject the opinion of an expert on foreign law or give it whatever probative value the court believes it deserves. *See United States* v. *First Nat'l Bank of Chicago*, 699 F.2d 341, 344 (7th Cir. 1983); *Pfizer Inc.* v. *Elan Pharm. Research Corp.*, 812 F. Supp. 1352, 1361 (D. Del. 1993). Further, a court may reexamine proffered statutory provisions to determine whether counsel's interpretation is accurate or plausible. *See Kashfi* v. *Phibro-Salomon, Inc.*, 628 F. Supp. 727, 737 (S.D.N.Y. 1986) ("It is clearly within the authority of the court to interpret and apply [*31] a foreign statute.").

Von Wobeser opines that under Mexican law, third-party beneficiaries must be "specifically designated" and that plaintiffs were not specifically designated as third-party beneficiaries in the Trust Agreement. Von Wobeser states, "It is my opinion that . . . Plaintiffs not being designated as beneficiaries, neither specifically, nor in general as noteholders, they cannot sue Bancomer as third-party beneficiaries." (Von Wobeser Aff. at 7) Von Wobeser appears to be of the view that if the Trust Agreement designated the noteholders generally, as a group, as third-party beneficiaries, plaintiffs would have standing.

Von Wobeser erred in concluding that the noteholders were not designated generally as third-party beneficiaries in the Trust Agreement. They were, in fact, designated by representation as a class. The Trust

Agreement names Bankers Trustee as the "Beneficiary in Warranty," "as Fiduciary in the [Indenture] and *in representation of all the parties listed as beneficiaries in said Agreement*." (Trust Agreement, § 4) (emphasis added) The Indenture, in turn, names the Noteholders as beneficiaries. (Indenture at 2, § 15.01) The Agreement adds that the [*32] Beneficiary, 3MAC, and the Beneficiary in Warranty, Bankers Trustee, shall be the sole beneficiaries, other than the Sidek subsidiaries, "of any other rights that derive from the Accounts Receivable" (Trust Agreement, § 5.2). Finally, the Agreement states "the Beneficiary in Warranty will have a direct right to execute this Contract against the Trustee." (Trust Agreement, § 19)

These provisions show that the Noteholders in fact were designated as third-party beneficiaries to the Trust Agreement. Bankers Trustee was named as a third-party beneficiary to the Agreement. Its designation was solely as a representative of the Noteholders; Bankers Trustee had no interest in the Trust Agreement other than a representative interest. The Noteholders therefore are, by extension, the true third-party beneficiaries of the Trust Agreement. Von Wobeser dismisses this argument, stating that "this representation gives [plaintiffs] no standing at all under Mexican law." (Von Wobeser Aff. at 6) Yet the only support Von Wobeser offers for this view is the statement in the Agreement that the Beneficiary and the Beneficiary in Warranty are the sole beneficiaries under the Agreement. The most logical [*33] interpretation of this statement, however, is that it merely rules out other possible beneficiaries; it does not affect those beneficiaries designated by virtue of Bankers Trustee's identification as Beneficiary in Warranty. Through Bankers Trustee as representative, plaintiffs are designated specifically as third-party beneficiaries to the Trust Agreement.

There is reason to reject not only Von Wobeser's application of Mexican law but also his view that Mexican law does not recognize intended third-party beneficiaries to a contract. Von Wobeser bases his conclusions on several provisions of the Mexican Civil Code and Commercial Code, which he quotes in his affidavit. However, these statutory provisions consist of two types of statutes, neither of which supports a requirement that third-party beneficiaries be designated specifically. First, Von Wobeser cites general principles of Mexican contract law which state that where there is a conflict between the express language and obvious intent of the contract, a court should interpret the contract as following the intent of the parties. [12] These provisions cannot be interpreted to require specific designation of third-party beneficiaries. [*34] Second, Von Wobeser cites specific provisions of Mexican law relating to third-party beneficiaries, none of which limits third-party beneficiaries to those designated specifically in the contract. [13]

12 Among the Mexican Civil Code provisions he quotes:

> In commercial transactions each party obligates itself in the manner and terms in which it is shown that it wanted to obligate itself without the validity of the commercial act having to depend on the observance of specific formalities and requirements.
>
> - Mexican Commercial Code, art. 78
>
> Contracts are perfected by mere consent, except those which must comply with formalities established by law. From the time they are perfected, contracts obligate the parties not only to that expressly agreed, but also to the consequences, which according to their nature result from good faith, custom and usage or the law."
>
> - Mexican Civil Code, art. 1796
>
> In civil contracts each party obligates itself in the manner and terms in which it is shown that it wanted to obligate itself without the validity of the contract requiring specific formalities except in those cases expressly indicated by law.
>
> - Mexican Civil Code, art. 1832
>
> If the terms of a contract are clear and leave no doubt as to the intent of the parties, one must abide by the literal sense of its clauses. If the words seem contrary to the evident intent of the parties, the latter shall prevail over the former.
>
> - Mexican Civil Code, Art. 1851
>
> Whatever the general terms of a contract, it cannot be understood that they include different things and different cases than those on

which the interested parties had the purpose of dealing.

- Mexican Civil Code, Art. 1852

[*35]

13 The provisions von Wobeser cites relating to third party beneficiaries include:

The settlor or founder [of the trust] can designate several beneficiaries to receive simultaneously or one after another the benefits of the trust except in the case of section II of article 59.

-General Statute on Negotiable Instruments and Credit Transactions, art. 348

Contracts may contain provisions for the benefits of third parties in accordance with the following articles.

-Mexican Civil Code, art. 1868

The stipulation made in favor of a third party causes this to acquire the right to demand from the promisor the thing to which he was obligated, except when there is a written agreement to the contrary. It also confers to the other stipulating party the right to demand from the promisor the fulfillment of said obligation.

-Mexican Civil Code, art. 1869

The right of the third party beneficiary is created at the moment when the contract is perfected, except for the right which the parties keep to themselves of imposing the conditions they may deem convenient, if and when these are expressly stated in the contract.

-Mexican Civil Code, art. 1870

[*36] Even those particular provisions which Von Wobeser cites for the proposition that third-party beneficiaries must be designated specifically do not suggest that express naming is required. Von Wobeser cites articles 1851 and 1852 of the Mexican Civil Code, set forth above. However, these provisions mean only that intent prevails over express wording if the two conflict. Von Wobeser cites also art. 348 of General Statute on Negotiable Instruments and Credit Transactions, which states, "The settlor or founder [of the trust] can designate several beneficiaries to receive simultaneously or one after another the benefits of the trust . . . ." This section does not limit the beneficiaries to those designated expressly, but merely permits some kind of designation. Especially in view of the other statutes, there is little reason to believe that Mexican law does not extend the triumph of the parties' intentions to third-party beneficiaries as well. Mexican law does not require that third-party beneficiaries be designated specifically.

Under such an interpretation of Mexican law, to secure dismissal on this Rule 12(b)(6) motion, defendant would have to demonstrate that plaintiffs could prove [*37] no set of facts showing that the parties intended plaintiffs to be third-party beneficiaries to the Trust Agreement. However, much of the evidence suggests that the parties did so intend. The language noted above naming Bankers Trustee as Beneficiary in Warranty, in representation of the Noteholders, is certainly compelling evidence of this intention. Further, the value of the receivables securing the Notes and providing the cash flow for interest and principal payments is ultimately the concern of the Noteholders. The Trust Agreement governs the treatment of these receivables and one of its stated purposes is to assure that the Noteholders receive their payments. (Trust Agreement, §§ IV(2) & 5(3) The Trust Agreement is part also of the larger transaction, to which the Noteholders were named beneficiaries. Certainly, plaintiffs could prove a set of facts showing that the parties to the Trust Agreement intended them as third-party beneficiaries to that Agreement. Plaintiffs do not lack standing.

Bancomer does not dispute that if plaintiffs are third-party beneficiaries to the Trust Agreement, they may sue Bancomer for breach of that agreement. *See* Mexican Civil Code, art. 1869 [*38] (third-party beneficiaries "acquire the right to demand from the promisor the thing to which he was obligated."); Mexican General Statute on Negotiable Instruments and Credit Transactions, art. 355 ("the Mexican Beneficiary shall have the right to bring suit against the Mexican Fiduciary Institution to carry out the purpose of the Mexican Trust"). Plaintiffs have standing to sue Bancomer under the Trust Agreement, either as specifically designated third-party beneficiaries or as intended third party beneficiaries. Because plaintiffs have standing to sue for breach of contract under Mexican law, I need not address Bancomer's argument

comer's argument that plaintiffs' other causes of action fail if they lack standing on the contract claim.

V.

Defendant Bancomer moves to dismiss also on the basis of *forum non conveniens*. It argues that Guadalajara, Mexico provides an adequate alternative forum for this litigation and that the traditional private and public interest factors that are balanced in the *forum non conveniens* analysis -- the *Gilbert* factors, *see Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 508, 91 L. Ed. 1055, 67 S. Ct. 839 (1947) -- favor transferring this [*39] action to Mexico. Plaintiffs assert that the Trust Agreement's forum selection clause is mandatory and requires that any action relating to the agreement be brought in New York or Guadalajara, Mexico, at plaintiff's choice. In addition, they argue that even if the clause is interpreted as a permissive forum selection clause, the *Gilbert* factors are not sufficiently tilted towards Mexico to overcome the required deference to plaintiffs' choice of forum.

A. *The Forum Selection Clause -- Mandatory or Permissive?*

[HN7] If a contract contains a mandatory forum selection clause, that clause controls unless the party seeking to escape its enforcement "clearly show[s] that [its] enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *M/S Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1, 15, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972); *see also Jones* v. *Weibrecht*, 901 F.2d 17, 19 (2d Cir. 1990). A court faced with a mandatory forum selection clause need not balance the *Gilbert* factors. However, if the clause is permissive, a court must perform the usual *forum non conveniens* analysis and [*40] apply the *Gilbert* factors. *Blanco* v. *Banco Industrial de Venezuela*, 997 F.2d 974 (2d Cir. 1993).

[HN8] Whether a forum selection clause is mandatory or permissive is a question of contract interpretation. *See Terra Int'l, Inc.* v. *Mississippi Chemical Corp.*, 922 F. Supp. 1334, 1370 (N.D. Iowa 1996). The interpretation of the Trust Agreement's forum selection clause is complicated because Mexican law governs, and neither party has submitted evidence of Mexican law on the interpretation of such clauses. However, as noted above, Bancomer, in connection with its standing argument, submitted several general provisions of Mexican law governing contract interpretation. Among these provisions are article 1851 of the Mexican Civil Code which provides that a contract's plain meaning governs, unless the terms of the contract and the parties' intent conflict, in which case intent governs, and Article 1852, which provides also that the parties' intent governs.

Further, when parties have failed to submit evidence on the content of foreign law, courts in this Circuit applying New York choice of law rules have found that the forum's law should fill the gaps. *See Loebig* v. [*41] *Larucci*, 572 F.2d 81, 85-86 (2d Cir. 1978); *Independent Order of Foresters* v. *Donaldson, Lufkin & Jenrette, Inc.*, 919 F. Supp. 149, 152 (S.D.N.Y. 1996) ("[HN9] In New York, it is required that a party wishing to apply the law of a foreign state show how that law differs from the forum state's law. Failure to do so results in the application of New York law."). [HN10] Under New York law, a forum selection clause is mandatory if it "indicates the parties' intent to make jurisdiction exclusive." *John Boutari and Son, Wines and Spirits, S.A.* v. *Attiki Importers and Distributors Inc.*, 22 F.3d 51, 52 (2d Cir. 1994) (quotations and citations omitted). [HN11] A contract specifying that a court "shall have jurisdiction" does not confer exclusive jurisdiction on that court, and is not a mandatory forum selection clause. *See John Boutari and Son*, 22 F.3d at 53. Rather, to be mandatory, a forum selection clause must contain "specific language of exclusion." *See City of New York* v. *Pullman, Inc.*, 477 F. Supp. 438, 442 n.11 (S.D.N.Y. 1979). Words such as "exclusively" or "only" are not required. "Any language that reasonably conveys the parties' intention to select an exclusive [*42] forum will do." *Water Energizers Ltd.* v. *Water Energizers, Inc.*, 788 F. Supp. 208, 212 (S.D.N.Y. 1992); *See Terra Int'l, Inc.*, 922 F. Supp. at 1373. Moreover, a contract that allows the plaintiff the choice of two litigation forums and provides that the chosen forum will be exclusive, is interpreted as a mandatory forum selection clause. *See Blanco*, 997 F.2d at 979.

Here, the Trust Agreement's forum selection clause provides:

> For the interpretation and fulfillment of this Contract, the parties are subject specifically to the jurisdiction and authority of the courts of the metropolitan zone of the City of Guadalajara, Jal., Mexico, or to the local or federal courts with jurisdiction with headquarters in the city, county and State of New York, at the choice of the plaintiff, waiving any other jurisdiction that might correspond by virtue of their present or future domiciles.

(Trust Agreement, cl. 19) I find that this clause is a mandatory forum selection clause. Although the clause at first glance seems permissive -- giving both the courts of New York and the courts of Guadalajara jurisdiction over a controversy arising under the Trust Agreement [*43] -- it adds the words "at the choice of the plaintiff." There would be little reason to add these words unless

the forum that the plaintiff does not choose no longer has jurisdiction and that forum is waived by the defendant. If, once the plaintiff chooses a forum, the defendant could nevertheless force transfer of the suit to the other forum, the words "at the choice of the plaintiff" would be superfluous. Plaintiff would have no real choice at all. In addition, the final phrase states "waiving any other jurisdiction that might correspond by virtue of their present or future domiciles." Through this phrase, the defendant waives all jurisdictions other than Guadalajara and New York. Thus, the clause effectively creates jurisdiction in only one place: the forum plaintiff chooses -- either New York or Guadalajara. The plain meaning of the clause and the most likely intention of the parties is that plaintiff's choice of the New York forum here is mandatory.

As noted, having found that the forum selection clause is mandatory, I may dismiss this action only if defendant can demonstrate that it would be unreasonable and unjust to enforce the clause, or that the clause was invalid for such [*44] reasons as fraud or overreaching. *See M/S Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1, 15, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972). Here, defendant has not argued that enforcement would be unreasonable or unjust or that the clause was fraudulently adopted. Thus, the mandatory forum selection clause must be enforced and the action cannot be dismissed on *forum non conveniens* grounds.

B. *Balancing the Gilbert Factors*

Even if the forum selection clause is interpreted as permissive, the deference accorded to plaintiffs' choice of forum, the balancing of the *Gilbert* factors, and the pendency of a closely related case in this jurisdiction requiring almost the identical evidence, mandate that the action not be dismissed on *forum non conveniens* grounds. [HN12] To prevail on a *forum non conveniens* motion, the defendant must demonstrate first, that an adequate alternative forum is available, and second, that "the balance of conveniences tilts strongly in favor of trial in the foreign forum." *R. Maganlal & Co.* v. *M.G. Chemical Co.*, 942 F.2d 164, 167 (2d Cir. 1991).

1. *The Adequacy of an Alternative Forum*

Defendant must demonstrate [*45] first that there exists an adequate alternative forum for the action.

> Ordinarily, this requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction. . . . In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied.

*Piper Aircraft* v. *Reyno*, 454 U.S. 235, 254 n. 22, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981). This factor does not appear to be in dispute. Bancomer is a Mexican corporation, with its principal place of business in Mexico and with offices in Guadalajara, Mexico. It claims that it is amenable to process and subject to personal jurisdiction in Guadalajara. (Huerta Aff. P 11) In addition, the Trust Agreement's forum selection clause -- if interpreted as permissive -- provides that Guadalajara courts have jurisdiction over the action. Plaintiffs do not contest that the Guadalajara courts are an adequate alternative forum and therefore this first requirement is satisfied.

2. *The Effect of the Bankers Trustee Action on Bancomer's Motion to Dismiss for Forum Non Conveniens*

[*46] In *Gilbert*, the Supreme Court held that [HN13] to assess the balance of conveniences, a court must consider the private interests of the litigants, such as "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Gulf Oil Corp.*, 330 U.S. at 508. The Court required also that a court consider the public interests of the prospective fora, such as avoiding docket congestion, "[the] local interest in having localized controversies decided at home," and having the trial in the forum whose law governs the case. *Id.* at 508.

[HN14] Generally, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil*, 330 U.S. at 508. Although courts have held that the choice of forum by a foreign plaintiff is entitled to less deference, here, plaintiffs are American citizens and the proposed alternative forum is a foreign forum. Therefore, plaintiffs' [*47] choice of forum is entitled to the traditional deference and it will not be upset unless the private and public interest factors weigh heavily in favor of trial in the alternative forum. *See R. Maganlal*, 942 F.2d at 167; *see also Olympic Corp.* v. *Societe Generale*, 462 F.2d 376, 378 (2d Cir. 1972).

Here, the pendency of plaintiffs' action against Bankers Trustee in this court alters somewhat the *Gilbert* analysis. The Indenture, to which Bankers Trustee is a party, contains a mandatory forum selection clause requiring litigation in this court and waiving any objections based on *forum non conveniens*. (Indenture, cl. 15.08) Accordingly, Bankers Trustee may not assert

*forum non conveniens*, and that action must remain in this court. The continued presence of the Bankers Trustee action in this court tilts the *Gilbert* balance in plaintiffs' favor. As will be demonstrated below, most of the documents and witnesses that might be relevant in the trial against Bancomer will be required also in the Bankers Trustee trial. Thus, the pendency of the Bankers Trustee action nullifies most of the *Gilbert* private interest factors that would [*48] otherwise favor transfer to Mexico, such as access to sources of proof and witnesses. Moreover, two of the public interest factors, judicial economy and administrative convenience, weigh heavily in favor of trying both cases in this court.

Other courts have denied *forum non conveniens* motions where a related action, requiring much of the same evidence, was pending also in the jurisdiction and could not be dismissed. For instance, in *In re Maritima Aragua, S.A.*, 823 F. Supp. 143 (S.D.N.Y. 1993), several actions were filed in this district relating to a collision of two vessels in Venezuela. M/V Mar Coral, one of the two vessels, filed an action in this district for exoneration and limitation of liability from claims arising from the collision under the Limitation of Liability Act, 46 U.S.C. § 183. Various claimants, including cargo interests, filed claims in that limitation proceeding. Several months later, some of these same claimants, *inter alia*, filed separate actions against the M.T. Trade Resolve, the other vessel involved in the collision. These actions against the Trade Resolve then were consolidated, and the Trade Resolve moved to dismiss on *forum* [*49] *non conveniens* grounds.

Judge Sweet denied the motion. Discussing the private interest factors, he noted,

> The crucial factor in the case at bar is the presence of the Limitation Proceeding brought by the owners of the Mar Coral here in New York, and which is not subject to -- and would not be affected by -- a successful motion to transfer the claims against the Trade Resolve Defendants to either London or Venezuela. The relevant witnesses, documents, translations, and other evidence will be litigated in this district regardless, and this factor tilts the balance of convenience in favor of this forum.

*Id.* at 147. In his analysis of the private interest factors, Judge Sweet found that many of the factors that might otherwise have favored transfer -- including claims of greater access to proof and witnesses in Venezuela, and the Trade Resolves' claims regarding the need for translation -- were neutralized by the continued presence of the limitation proceeding in the United States. Further, in analyzing the public interest factors, he found that judicial economy and administrative convenience were served by keeping the action in this district, where the other [*50] action would be litigated.

Other courts have held similarly that where a defendant in an action moves to dismiss on the basis of *forum non conveniens* and a second action requiring much of the same evidence is pending in the same court and is not dismissible, the preference for a single forum should weigh heavily. *See Avianca, Inc.* v. *Corriea*, No. 85-3277, 1991 WL 496132, at *3 (D.D.C. May 31, 1991); *Cargill, Inc.* v. *Hartford Accident & Indem. Co.*, 531 F. Supp. 710, 714-15 (D. Minn. 1982) (noting convenience, judicial economy and possibility of inconsistent results as reasons to litigate related actions in same forum); *cf. Kearney* v. *Savannah Foods & Indus., Inc.*, 350 F. Supp. 85, 88 (S.D. Ga. 1972) (declining to dismiss admiralty case because related case will continue in American court and "cutting a lawsuit in two and litigating the halves in different countries strikes me as an anfractuous way to handle litigation crying for single rather than piecemeal situation"). Thus, here, the continued pendency of the Bankers Trustee action weighs heavily against dismissal.

3. *Access to Sources of Proof and Witnesses*

Bancomer argues that these [*51] two factors tilt heavily towards dismissal. It argues that all of the documents relating to the receivables are located in Mexico, including "the installment sales contracts, the promissory notes, and correspondence relating to the Mexican Receivables and Bancomer's role as receivables trustee." (Huerta Aff. P 21) Further, Bancomer claims that all of these documents are in Spanish and must be translated (Huerta Aff. P 22), which will generate significant costs for the parties. *Blanco*, 997 F.2d at 982.

As to willing witnesses, Bancomer claims that the "ten or so Bancomer personnel familiar with Bancomer's role as receivables trustee" are all in Mexico. (Huerta Aff. P 23) As to unwilling witnesses, Bancomer identifies one former Bancomer employee familiar with the underlying transaction. (Huerta Aff. P 25) Moreover, Bancomer claims that the testimony of all of these witnesses will require translation if the case stays here because their native language is Spanish.

Plaintiffs counter that defendants have not provided specifics on how much documentation relating to the receivables exists. Moreover, they argue that documents are easily transportable. As to the witnesses, plaintiffs [*52] argue that Bancomer has failed to provide as much information on prospective witnesses as is required for the court to balance the parties' interests. *See Piper*

*Aircraft Co.* v. *Reyno*, 454 U.S. 235, 258, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981). Moreover, they argue that this is a document-intensive case that will focus on whether defendants complied with obligations measured principally by the contents of documents, and that live testimony of witnesses is unimportant. As to Bancomer's former employee, plaintiffs argue that Bancomer can obtain his testimony through depositions or letters rogatory. *See Overseas Programming Co.* v. *Cinematographische Commerz-Anstalt*, 684 F.2d 232, 235 (2d Cir. 1982). Finally, as concerns the translation of documents and witnesses, plaintiffs note that: 1) many of the documents, including the three main agreements, have been translated already; 2) Spanish is not an obscure language and translators are easily obtainable; and 3) translation will be necessary even if the matter is litigated in Mexico. *See, e.g., Reavis* v. *Gulf Oil Corp.*, 85 F.R.D. 666, 672 n.5 (D.Del. 1980).

Even without considering the pendency of the [*53] Bankers Trustee action, the accessibility of documents factor would weigh only slightly in Bancomer's favor. Most of the documents are in Mexico. However, Bancomer has not revealed how many documents likely would be produced, and therefore it is hard to ascertain the difficulty of transporting documents, which as noted are generally relatively easy to ship. *R. Maganlal & Co.*, 942 F.2d at 169. Because plaintiffs are American, they will likely have to translate the documents even if the action is litigated in Mexico. Further, some of the more lengthy documents -- the three agreements -- have been translated already. *See also Manela* v. *Garantia Banking Ltd.*, 940 F. Supp. 584, 594 (S.D.N.Y. 1996); *Alliance Assurance Co.* v. *Luria Bros. & Co.*, No. 86 Civ. 1151, 1987 WL 10031, at *5 (S.D.N.Y. Apr. 22, 1987).

Similarly, the witness factor likely would weigh only slightly in favor of Mexico. Most of the witnesses, including Bancomer, 3MAC and Sidek employees, are likely to be located in Mexico. Although it would be expensive to transport them all to New York, there would be some expense in requiring these American plaintiffs to litigate in Mexico. Bancomer does [*54] not specifically identify what the testimony of its former employee might be or the prejudice arising from the absence of live testimony. *See Manela*, 940 F. Supp. at 592. In addition, Bancomer has not stated that this former employee will not testify voluntarily and it does not claim that it would be impossible to obtain deposition testimony, only that "obtaining such testimony by letters of request under applicable treaties for taking evidence abroad could result in lengthy delays." (Huerta Aff. P 25) As for the translation of witnesses' testimony, although Bancomer states that the native language of most of these Mexican witnesses is Spanish, it does not state that they do not speak English as well.

When the Bankers Trustee action is added to the mix, the document and witness factors favor retaining the case. The crux of plaintiffs' claims is that defendants failed to receive certain certifications required by the agreements before releasing the receivables. Most of the evidence in the cases is likely to focus on whether defendants received these certifications. Before permitting Sidek or one of its subsidiaries to substitute receivables, the trustees must receive certain [*55] documents: 1) Sidek's subsidiaries must certify to Bancomer that all substitute receivables meet the requirements of Indenture § 3.13 (Trust Agreement, § 7); 2) Sidek must provide Bankers Trustee with an amended Exhibit 5 to the Indenture, which is a listing and description of each receivable assigned to 3MAC (Indenture, § 3.12(c)); 3) Sidek must provide Bancomer with a similar list describing the receivables (Beneficiary Designation Agreement, § 9(D)(i)); 4) Sidek must give 3MAC, Bankers Trustee, and Bancomer written notice of any receivable substitutions identifying: a) the new receivable; b) the cash flow characteristics of the new receivable; and c) the former account receivable or the cash in the principal account being used to purchase this receivable. (*Id.*, § 9(A)); 5) Sidek's General Counsel must give Bankers Trustee a certificate stating that certain conditions have been satisfied (Indenture, § 3.13(c)); 6) 3MAC's accountants must give Bankers Trustee a certificate stating that other conditions have been satisfied, including that each receivable has certain cash flow characteristics (*Id.*, § 3.13(b)(7), (c)); 7) Bancomer must supply Bankers Trustee with a certificate [*56] stating, *inter alia*, that: a) the new receivable has a principal balance not less than the principal balance of the former receivable; and b) the new receivable will generate interest that is sufficient to cover liabilities and that will not be less than the interest generated by the former receivable (Beneficiary Designation Agreement, § 9(C)); 8) Sidek and the substituting party must certify to Bancomer and Bankers Trustee that the substitute account receivable is owned by Sidek or a subsidiary (*Id.*, § 9(c)(iii)); and 9) Sidek's internal consultant must provide Bankers Trustee and Bancomer with an opinion that the substitute receivable meets certain requirements (*Id.*, § 9(D)(v)). In addition, before releasing a receivable for which another is not being substituted, Bankers Trustee must ensure that "such Promissory Note and Installment Sales Agreement has been paid in full by or on behalf of the applicable purchaser." (Indenture, § 3.14(b)) The witnesses in both trials are likely to be employees of 3MAC, 3MAC's accountants, 3MAC's general counsel and consultant, and Bancomer and Banker Trustee employees who have knowledge of these certificates and documents, and were [*57] involved in the receivable substitution process. In addition, the

documents relevant to both trials are likely to be drawn from these sources as well.

A review of Bancomer's and Bankers Trustee's obligations under the agreements demonstrates that many of the certifications they were to receive overlap, and that almost the same documents and witnesses will be required in both actions. Thus, no matter where the Bancomer action is litigated, nearly the same documents and witnesses will have to be transported to New York, and the documents and testimony translated, for the Bankers Trustee action. Therefore, these two factors -- access to sources of proof and witnesses -- do not favor dismissal, because inconvenience and difficulty will be incurred even if the Bancomer action is litigated in Mexico.

4. *View of the Premises*

Bancomer argues that this action concerns the substitution of receivables, and that the property underlying those receivables is in Mexico and can be viewed only there. Although it is true that the property is in Mexico, it is unlikely that a jury would have to view the property to resolve this action. As noted, the key issue is likely to be whether defendants [*58] received the required documentation. The agreements did not require that defendants verify the information within that documentation. Even if verification of the values of the receivables were required, viewing the premises would not be very helpful to that determination, and this factor does not favor dismissal.

5. *Local Interest in the Controversy*

The local interest factor favors dismissal only slightly. As Bancomer argues, most of the actions relate to activities that took place in Mexico, by a Mexican trustee, pursuant to an agreement executed in Mexico, and relating to receivables on Mexican real estate. However, New York does have some interest in this controversy. Plaintiffs have their principal place of business in New York and thus their losses were felt here. *See In re American President Lines, Ltd.*, 890 F. Supp. 308, 317 (S.D.N.Y. 1995); *Virgin Atlantic Airways Ltd.* v. *British Airways P.L.C.*, 872 F. Supp. 52, 61 (S.D.N.Y. 1994); *In re Maritima Aragua, S.A.*, 823 F. Supp. at 148. Also, related agreements, including the Indenture, the Notes and the put agreements, all apply New York law. *Cf. Overseas Programming Co.* v. *Cinematographische* [*59] *Commerzanstalt*, 684 F.2d 232, 235 (2d Cir. 1982) (holding that New York had substantial nexus to litigation where several of the agreements governing contractual rights to a film, the major issue in case, were governed by New York law).

6. *Familiarity with Applicable Law*

Because Mexican law governs the Trust Agreement, this factor favors dismissal. However, "[HN15] the need to apply foreign law is not alone sufficient to dismiss under the doctrine of *forum non conveniens*." *R. Maganlal & Co.*, 942 F.2d 164, 169 (2d Cir. 1991). Moreover, although Mexican law applies to interpretation of the Trust Agreement, that Agreement incorporates some of the obligations of the Indenture, which is governed by New York law, and therefore Mexican law does not govern exclusively.

7. *Administrative Convenience and Judicial Economy*

As noted, because of the continuation of the Bankers Trustee action in this court, this factor weighs heavily against dismissal. [14] Certainly, the applicability of two different laws to the Trust Agreement and the Indenture will complicate any eventual trial. However, Bancomer has failed to point out any vast differences between Mexican and New York contract [*60] law. To take the most extreme consequence, even if two juries must be empaneled because of differences in the law, most of the testimony will overlap and therefore one trial here will be more efficient than two trials in separate countries.

> 14 Bancomer might argue that it should not be inconvenienced because Bankers Trustee's action must be litigated in New York. However, when analyzing *forum non conveniens* factors, a court must consider the interests of justice, rather than the parochial interests of a single defendant.

When the presence of the Bankers Trustee action in this forum is considered, only two factors -- the applicable law and the local interest in the controversy -- favor litigation in Mexico. When compared with the administrative convenience and the judicial economy that result from litigating the Bancomer and Bankers Trustee actions in the same jurisdiction, and the traditional deference given to plaintiff's choice of forum, the scales tilt against dismissal. Therefore, Bancomer's [*61] motion to dismiss on the basis of *forum non conveniens* is denied.

For the foregoing reasons, defendant Bancomer's motion to dismiss for lack of ripeness and standing, and on the basis of forum non conveniens is denied, and Bankers Trustee's motion to dismiss for lack of ripeness and standing is denied.

SO ORDERED:

Dated: New York, New York

February 4, 1997

Michael B. Mukasey,

U.S. District Judge